# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Town of Cicero v. Metropolitan Water Reclamation District of Greater Chicago,*
**2012 IL App (1st) 112164**

---

| | |
|---|---|
| Appellate Court Caption | THE TOWN OF CICERO, an Illinois Municipal Corporation, on Its Own Behalf and on Behalf of Its Residents and Property Owners, Plaintiff-Appellant, v. THE METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, a Local Public Entity, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2164 |
| Filed | August 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff city had no cause of action for monetary damages or injunctive relief under the Metropolitan Water Reclamation District Act for the damages its residents suffered from flooding and sewage backups due to heavy rains, since the Act was only intended to provide relief for flooding caused by the reversal of the Chicago River and the construction of the main drainage channel pursuant to the Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-034318; the Hon. Michael B. Hyman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

George S. Spataro, K. Austin Zimmer, and Michael T. Del Galdo, all of Del Galdo Law Group, LLC, of Berwyn, for appellant.

Ronald M. Hill, James J. Zabel, and Ellen M. Avery, all of Metropolitan Water Reclamation District of Greater Chicago, of Chicago, for appellee.

Matthew S. Ponzi, Douglas J. Palandech, Michael A. Kuiken, and Jonathan A. Mraunac, all of Foran Glennon Palandech Ponzi & Rudloff PC, of Chicago, for *amici curiae*.

Panel

JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, the town of Cicero, on its own behalf and on behalf of its residents and property owners (Cicero), filed suit against defendant, the Metropolitan Water Reclamation District of Greater Chicago (the District), seeking monetary damages and injunctive relief after its residents allegedly sustained property damage as a result of flooding and sewage backup. The circuit court of Cook County dismissed the complaint pursuant to section 2-615 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-615 (West 2010)). Cicero appeals that dismissal.[1] For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3    The issues in this case arise from the Metropolitan Water Reclamation District Act (the Act) (70 ILCS 2605/1 *et seq.* (West 2010)), which was passed in 1889, as "An Act to create sanitary districts and to remove obstructions in the Des Plaines and Illinois Rivers" (1889 Ill. Laws 126). We find that a review of the undisputed facts and circumstances leading to the passage of this statute is necessary to an understanding of the issues raised in this appeal.[2] In the 1800s, one of the challenges facing the City of Chicago (the City) was the

---

[1]We allowed Allied World Assurance Company, Inc.; Hiscox Lloyd's, London, Syndicate 3624; and Ironshore Specialty Insurance Company to submit an *amici curiae* brief in support of Cicero. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

[2]These facts are taken from our supreme court's review of the history of the Act in *Canal Commissioners v. Sanitary District of Chicago*, 191 Ill. 326 (1901), *City of Chicago v. Green*, 238 Ill. 258 (1909), and *Gentleman v. Sanitary District of Chicago*, 260 Ill. 317 (1913).

development of systems to ensure a safe water supply and the disposal of sewage and waste. The custom at the time was to draw water from Lake Michigan for the City's municipal needs. The water was taken only a short distance from the mouth of the Chicago River, which was the City's main sewer. As the population and industry in the City grew, drainage and sewage were increasingly carried into Lake Michigan, thereby contaminating the waters of the lake. In the mid-1800s, the state constructed the Illinois and Michigan Canal (the Canal), which extended from the Chicago River to Peru, Illinois. For many years, the City made numerous efforts to keep sewage and drainage out of Lake Michigan by pumping it into the Canal so that it would flow into the Illinois River system. However, the problem of sewage and drainage flowing from the Chicago River into Lake Michigan continued as the population of the City grew.

¶ 4 To remedy this problem, the Illinois legislature passed the Act in 1889. The Act created what is now known as the District in order to preserve the public health by improving the facilities for the disposal of sewage and the supply of pure water. Although the Act created various districts of contiguous territory, it was principally concerned with the needs of the City and the creation of the District. To prevent the City's drainage and sewage from being carried into Lake Michigan and to provide a common outlet for the sewage of the incorporated municipalities within the limits of the District, the Act authorized the District to reverse the flow of the Chicago River and to issue bonds to fund the construction of the "Drainage Canal," now known as the Sanitary and Ship Canal (the main channel). The Act also authorized the District to build any adjuncts and additions necessary to connect all of the sewers and drains of the municipalities within the District to the main channel. The main channel was completed in 1899 and ran from the Chicago River to Lockport, Illinois. The main channel connected the Chicago and Calumet River systems to the Des Plaines River, reversing the flow of those rivers away from Lake Michigan and into the Illinois and Mississippi Rivers.

¶ 5 The legislature was aware that construction of the main channel and reversal of the Chicago River would cause a large amount of sewage to flow through the main channel into the Illinois and Des Plaines Rivers. Because of the potential effects that this sewage could have on people living near those rivers, the main channel was also intended to cause a large amount of water to flow from Lake Michigan though the main channel and into the Illinois and Des Plaines Rivers in order to dilute the sewage and render it innocuous. The legislature was also aware that such a large amount of water would cause flooding in the Illinois and Des Plaines River valleys and thereby damage the property of those living near the rivers. To address concerns about health effects and property damage resulting from construction of the main channel, and to gain support for the passage of the Act, the legislature included a provision in the Act that imposed strict liability on the District and required it to pay for all damages to private property that were caused by construction of the main channel. See 70 ILCS 2605/19 (West 2010).

¶ 6 With this background in mind, we now turn to a consideration of the issues raised in this appeal. In 2010, Cicero filed a three-count complaint against the District. Cicero made the following allegations in its complaint.

¶ 7 Under the Act, stormwater management in Cook County is under the exclusive control

of the District. The Act authorizes the District to prescribe rules and regulations for floodplain and stormwater management and for governing the location, size and release rate of all stormwater runoff channels, streams and basins in Cook County. The District's service area includes the town of Cicero and approximately 125 other municipalities. To achieve its public purpose in Cicero, the District's structures connect with Cicero's local sewage system in order to receive, treat and dispose of Cicero's sewage. The District has also created the "Tunnel and Reservoir Plan" (TARP) to, among other things, provide an outlet for floodwaters to reduce street and basement sewage backup flooding. TARP is comprised of a system of plants, canals, reservoirs, pumping stations, locks, rivers, tunnels, connecting structures and flow control devices. The District also maintains and controls a system to anticipate heavy rainfall in order to prepare for the safe and expeditious drainage of stormwater and sewage to prevent street and basement flooding.

¶ 8        According to the complaint, on two occasions in June and July 2010, Cook County experienced heavy rainfall that required the District to use its systems and devices to assist Cicero's systems in the disposal of sewage and stormwater. Cicero's sewage system reached capacity and then overflowed into the streets and homes in the area. Shortly after this occurred, the flow of sewage out of the system reversed itself and drained back down into the system.

¶ 9        Cicero alleged that the District failed to use its systems and historical data to adequately anticipate the need to open its devices to receive and treat sewage collected within Cicero. Cicero also alleged that the District failed to use its systems before flooding occurred and sewage began to back up into the streets and homes of Cicero. Cicero alleged that during these occurrences of heavy rainfall, the District opened locks in Wilmette, Illinois, to release sewage from its storage facilities to prevent flooding and sewage backup in the north shore of the Chicagoland area. However, the District did not open the locks in Lockport, Illinois, to prevent flooding in the western and southern suburbs of the Chicagoland area.

¶ 10       Cicero further alleged that during the periods leading up to the heavy rainfall, it unsuccessfully attempted to contact the District for help. Only a general complaint number was available and no help was offered when Cicero's officials reached someone at that number. Aside from this general number, Cicero's officials do not have a means to contact the District in emergency situations to coordinate efforts before flooding occurs.

¶ 11       In count I of its complaint, titled "Action for Accountability," Cicero sought an order compelling the District to communicate and cooperate with Cicero to avoid backup sewage and flooding. Count II sought a permanent injunction ordering the District to anticipate heavy rainfall and to handle excess stormwater before backup sewage flooding occurred. Count III sought monetary damages under section 19 of the Act (70 ILCS 2605/19 (West 2010)), based on the District's alleged failure to accurately predict and manage sewage backup flooding, which resulted in damage to real and personal property during the periods of heavy rainfall mentioned above.

¶ 12       The circuit court granted the District's motion to dismiss the complaint pursuant to section 2-615 of the Code. The court dismissed count I with prejudice, ruling that there was no cause of action for "accountability" and that Cicero therefore failed to state a claim upon

which relief could be granted. The court dismissed count II without prejudice, ruling that Cicero had failed to sufficiently allege a clear and ascertainable right in need of protection. Finally, the court dismissed count III with prejudice, ruling that the legislative history of section 19 of the Act demonstrated that it did not apply to the type of claims asserted by Cicero and that count III therefore failed to state a claim on which relief could be granted.

¶ 13     Cicero filed an amended complaint, repleading count II and alleging that, under the Act, its residents had a clear and ascertainable right to the continued use and enjoyment of their property free from interference from backup sewage flooding. Cicero requested that the trial court permanently order the District to properly anticipate heavy rainfall, to implement and activate procedures for handling excess stormwater before backup flooding occurs, and to create a communication system with Cicero so that it could be kept informed of the threat of heavy rainfall and so that the District and Cicero could coordinate efforts to prevent backup flooding. The trial court dismissed this count under section 2-615 of the Code, ruling that the sections of the Act relied upon by Cicero did not provide it with a clear and ascertainable right in need of protection. This appeal followed.

¶ 14                                          ANALYSIS

¶ 15     Cicero contends that the trial court erred by dismissing its complaint pursuant to section 2-615 of the Code. "A motion to dismiss pursuant to section 2-615 attacks the legal sufficiency of the complaint. [Citation.] A court reviewing an order granting a section 2-615 motion takes all well-pled facts as true. [Citation.] On review of a section 2-615 dismissal, the court must determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, sufficiently set forth a cause of action on which relief may be granted. [Citation.]" *Uhlich Children's Advantage Network v. National Union Fire Co. of Pittsburgh, PA.*, 398 Ill. App. 3d 710, 714 (2010).

¶ 16     We review a circuit court's dismissal of a complaint pursuant to section 2-615 *de novo*. *Uhlich Children's Advantage Network*, 398 Ill. App. 3d at 714. This appeal also raises questions of statutory interpretation, which are reviewed *de novo. Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 595 (2005).

¶ 17     Cicero first contends that the trial court erred when it dismissed count III of its complaint, which sought monetary damages under section 19 of the Act.

¶ 18     Section 19 states:

"Every sanitary district shall be liable for all damages to real estate within or without such district which shall be overflowed or otherwise damaged by reason of the construction, enlargement or use of any channel, ditch, drain, outlet or other improvement under the provisions of this act; and actions to recover such damages may be brought in the county where such real estate is situated, or in the county where such sanitary district is located, at the option of the party claiming to be injured. And in case judgment is rendered against such district for damage, the plaintiff shall also recover his reasonable attorney[ ] fees to be taxed as costs of suit: Provided, however, it shall appear on the hearing of plaintiff's motion to tax such attorney[ ] fees, that the plaintiff notified the trustees of such district, in writing, at least 60 days before suit was commenced by

-5-

leaving a copy of such notice with some one of the trustees of such district, stating that he claims damages to the amount of ............ dollars by reason of (here insert the cause of damage) and intends to sue for the same: And, provided further, that the amount recovered shall be larger than the amount offered by said trustees (if anything) as a compromise for damages sustained." 70 ILCS 2605/19 (West 2010).

Section 19 imposes strict liability, and therefore a plaintiff suing under this section does not need to prove negligence by the District to recover. *Jones v. Sanitary District of Chicago*, 265 Ill. 98, 100 (1914).

¶ 19     Our analysis of the issues raised in this appeal is guided by well-established principles of statutory interpretation. The primary rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. *In re Marriage of Rogers*, 213 Ill. 2d 129, 136 (2004). The best evidence of the legislature's intent is the language of the statute, which must be given its plain and ordinary meaning. *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006). All of the provisions of a statutory enactment should be viewed as a whole. Words and phrases should not be construed in isolation but, instead, must be interpreted in light of other relevant provisions of the statute. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). In determining the plain and ordinary meaning of statutory terms, we must consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it. *People v. Davis*, 199 Ill. 2d 130, 135 (2002); see also *Lieberman*, 201 Ill. 2d at 308 ("[I]n determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved."). "Legislative intent can be ascertained from a consideration of the entire Act, its nature, its object and the consequences that would result from construing it one way or the other." *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 96 (1990). Even where the wording of a statute is clear and unambiguous, "if there [is] any doubt as to its meaning the courts may, in order to find its purpose or intent, take into consideration the contemporary circumstances and external or historical facts which led to its enactment and read it in the light of such surrounding facts." *Green*, 238 Ill. at 268.

¶ 20     Cicero claims that section 19 provides it with the right to seek damages for the flooding and sewage backup alleged in its complaint and that this court should follow the decision in *Pineschi v. Rock River Water Reclamation District*, 346 Ill. App. 3d 719 (2004). The *amici* more specifically argue that the phrase "channel, ditch, drain, outlet, or other improvement" in section 19 refers to the District's current water management systems. Therefore, the *amici* conclude, section 19 allows for the recovery of "any type of damage to real property involving water," whether resulting from overflow of a sewer system, a ruptured pipe or a stream or river. The District, on the other hand, claims that section 19 does not apply to the circumstances of this case but, instead, was intended solely to compensate downstream landowners for flooding when the District constructed the main channel of the Sanitary and Ship Canal and reversed the flow of the Chicago River at the turn of the twentieth century. We agree with the District.

¶ 21     The phrase "channel, ditch, drain, outlet, or other improvement" does not refer to the water management or sewage systems maintained by the District. As our supreme court

recognized, the Act was not passed to give the District the power to construct or control ordinary sewers and drains for the purpose of draining the territory within the District's limits. See *Green*, 238 Ill. at 264, 267-68. Instead, the Act was passed to provide a common outlet for all of the sewers within the boundaries of the District. See *Green*, 238 Ill. at 264. This was to be principally accomplished by construction of the main channel. See *Green*, 238 Ill. at 265. As the court recognized:

> "In almost every section, as the [A]ct was originally passed, the improvement proposed is designated by the words 'channel' or 'outlet,' and if the words 'drain' or 'ditch' are used they are found in connection with the words 'channel' or 'outlet,' in such a manner as to indicate that all of the words are used with practically the same meaning." *Green*, 238 Ill. at 271.

Based upon the foregoing, the only reasonable interpretation is that the phrase "channel, ditch, drain, outlet, or other improvement" refers only to the main channel and not to the sewage or water management systems maintained by the District.

¶ 22 Moreover, it was not until 1921 that the District was given the power to construct facilities to treat wastewater prior to it being released into local waterways. Before that time, wastewater was forced through the Chicago River and the main channel into the Des Plaines and Illinois Rivers and ultimately into the Mississippi River. See *Green*, 238 Ill. at 269. However, this wastewater adversely affected those living in the Illinois and Des Plaines River valleys, and thus section 7 of the Act was amended to allow the District to construct wastewater treatment facilities and intercepting sewers to collect wastewater from the City of Chicago and other local municipalities. Specifically, before 1921, section 7 of the Act provided:

> "The board of trustees of any sanitary district organized under this act shall have power to provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner ***." 1889 Ill. Laws 129.

¶ 23 Section 7 was amended in 1921. Among other things, the amendment incorporated the following provision authorizing the board of trustees of the District (Board) to:

> "lay out, establish, construct and maintain, or provide for the laying out, establishing, constructing and maintaining of sewage disposal and treatment plants and works, within or without the territorial boundaries of such sanitary district, that may be advantageous or necessary in preventing the water in any channel, ditch, drain, outlet or other improvement of the sanitary district discharged into or through any river or stream of water beyond or without the limits of the district constructing the same from becoming offensive or injurious to the health of any of the people of the State, and, in the case of the sanitary district of Chicago, beginning with the year 1925, some efficient method of treating sewage other than by water dilution shall be annually provided to create an effluent thereof which shall not be offensive or injurious to the health of any of the

people of the State, and which shall be adequate to care for a population of not less than 300,000, until at least 60 per centum of the present population of the sanitary district of Chicago has been provided for ***." 1921 Ill. Laws 326-27.

See also 70 ILCS Ann. 2605/7, Historical & Statutory Notes, at 352 (Smith-Hurd 2005). This amendment recognizes the main channel as "any channel, ditch, drain, outlet or other improvement," and explains that the sewage treatment plants and intercepting sewers are separate and distinct from the "channel, ditch, drain, outlet, or other improvement." Thus, the phrase "channel, ditch, drain, outlet, or other improvement" refers to the main channel constructed after the Act was passed. Accordingly, the plain language of section 19 indicates that it provides compensation for damages suffered as a result of flooding related to the construction of the main channel, and not flooding and sewage backup that result from instances of heavy rainfall.

¶ 24    Our interpretation of section 19 is confirmed by a consideration of the contemporary circumstances and historical facts leading to the passage of the Act and the inclusion of section 19. As previously noted, the Act was passed in response to the problem of sewage flowing into and contaminating Lake Michigan, the source of the area's water supply. See *Green*, 238 Ill. at 268-70. The main channel was constructed and the Chicago River was reversed to alleviate this problem by providing a common outlet for the City's sewage and directing that sewage into the Illinois and Des Plaines Rivers. *Green*, 238 Ill. at 267-70; *Gentleman*, 260 Ill. at 319-20. However, because of the health effects that this sewage could have on the people living by these rivers, the main channel was also intended to cause a significant amount of water to flow through the channel into those rivers to dilute the sewage flowing through them. See *Green*, 238 Ill. at 265 ("[Construction of the main channel] will also cause a large flow of water from the lake, through the proposed artificial channel, into those rivers for the purpose of diluting the sewage and rendering it innocuous to the people living along the course of those streams." (Internal quotation marks omitted.)).

¶ 25    Comments made before the Board in 1891 reflect that section 19 was included in the Act specifically to assuage concerns regarding property damage from flooding caused by construction of the main channel and the effect that such a large amount of sewage could have on the health of those living in downstream areas. The president of the Board stated:

> "The Legislature and the law have provided for all the interests of the people, and the property outside of the Sanitary District that may or could be affected by construction or use of the channels that this District must make, and have made ample provision against any possible danger to the health of the people of the Illinois Valley by requiring the dilution of the sewage output of this District by means of vast volumes of water, and by providing that the District must pay for all damages that may accrue to private property in Des Plaines and Illinois Valleys, and have left no discretion whatever to this District or this Board with respect to these matters, so that in addition to the desire of the people of the District and of this Board that our neighbors and fellow-citizens shall not be damaged or hurt in respect to health or property there exists the plain law prohibiting the doing of each of these things, a law enforceable in the Courts of Cook County and in all counties to the mouth of the Illinois River." Proceedings of the Board of Trustees of the Sanitary District of Chicago, Jan. 3, 1891, at 105.

¶ 26    Our supreme court discussed the purpose of section 19 in *Gentleman*, 260 Ill. at 320-21, and its comments are in accord with those made before the District's Board. In that case, the plaintiff claimed that the portion of section 19 that authorizes the recovery of attorney fees by a person suing for damages to land flooded or otherwise damaged was in conflict with the portion of the Illinois Constitution that forbids the granting of special or exclusive privileges to any association or individual. *Gentleman*, 260 Ill. at 320. In rejecting that argument, the court observed:

> "The statute authorized [the District] to connect the waters of Lake Michigan with the De[s P]laines and Illinois [R]ivers so as to cause the waters of the lake to flow into the rivers; to enter upon, widen, deepen, and improve any navigable or other waters, waterways, canal or lake, and to acquire the right of way for its channel throughout the state. No other kind of municipal corporation has such extensive powers of the kind exercised by corporations organized under this law. Their capacity to inflict damage reaches far beyond their own territory and affects a wide area. They exercise extraordinary powers given them by the state. They constitute a class by themselves, and their relation to the owners of property which they may injure is such that it cannot be said to be unjust to require them, upon reasonable notice, to pay the damages they have inflicted ***." *Gentleman*, 260 Ill. at 319.

The court continued:

> "It is also argued that section 19 violates [the state and federal constitutions] because it deprives the appellant of its property without due process of law and deprives it of the equal protection of the laws. These claims are based upon the proposition that cities, villages, municipal corporations, railroad corporations, drainage and levee districts, and others, may overflow or otherwise damage land by the construction and operation of their works and are not liable to the payment of attorney's fees to persons whose property they have injured. What has been heretofore said answers this argument also. No other corporation has powers commensurate with those of the Sanitary District of Chicago. It was organized because of this fact. The act authorizing its organization was passed giving it power to do what no other corporation could do. Its purpose was to furnish a common outlet for the sewage of the incorporated municipalities within the limits of the district. It was given power, for this purpose, to cause the waters of Lake Michigan to flow down through the Illinois [R]iver, to enter upon and use the navigable waters of the State and to injure and destroy property far beyond its limits. To turn this large quantity of water into the Illinois [R]iver was necessarily to affect injuriously the lands of riparian owners and to materially affect the river throughout its course. It was no more than just that the act should provide, by such means as might be practicable and effective, for requiring prompt payment for the injuries thus inflicted. The privileges granted were greater than those possessed by any other corporation and the liability for attorney's fees was a part of the terms of the grant. The act which authorized the creation of the corporation imposed the liability complained of. There is no deprivation of property. The appellant agreed to pay the attorneys' fees when it organized under the act. The burdens go with the privileges." *Gentleman*, 260 Ill. at 320-21.

See also *Jones*, 265 Ill. at 100 ("The statute creates liability against the district for all

-9-

damages that may result to any landowner by reason of turning the water from said district into the Illinois [R]iver.").

¶ 27    These statements and discussions reflect a legislative awareness that construction of the main channel and reversal of the river would cause sewage to flow to downstream areas as well as flooding and damage to the property of those living downstream. The comments further reflect the legislature's awareness that this damage would extend to areas far beyond the District's geographical limits. Section 19 was therefore passed to ease concerns about these sewage and flooding problems and to compensate downstream landowners for damages to their property resulting from construction of the main channel and reversal of the Chicago River.

¶ 28    Viewed in this context, it is apparent that section 19 was not intended to apply to the circumstances of this case. The damages alleged in this case were not caused by flooding that resulted from construction of the main channel or reversal of the Chicago River. Instead, they were caused by natural instances of heavy rainfall that caused Cicero's systems to back up until they flooded parts of the town. These are not the types of damages envisioned by the legislature when it passed section 19 of the Act.

¶ 29    Our interpretation of the intent of section 19 is further supported by the fact that the legislature has amended other sections of the Act while retaining section 19 in its original form.[3] As originally enacted, section 7 of the Act granted the District the power to "provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets *** together with such adjuncts and additions thereto as may be necessary." 1889 Ill. Laws 129. As set forth above, section 7 was amended in 1921 to give the District the additional power to construct and maintain "sewage disposal and treatment plants and works." 1921 Ill. Laws 326-27. However, the legislature did not amend section 19 to provide a cause of action with regard to the exercise of these new powers.

¶ 30    The legislature amended the Act again in 1959 by adding section 7d. See 70 ILCS 2605/7d (West 2010) (added by 1959 Ill. Laws 1701). It is pursuant to this section that the District has extended its drains, ditches and other structures to connect with Cicero's sewage system in order to receive and dispose of sewage collected in Cicero. Section 7d of the Act states:

"The [District], in addition to other powers vested in it, is authorized to enter into agreements with any city, village or incorporated town located partly within and partly without the territorial limits of the sanitary district and which has a sewage system to receive and dispose of all sewage of such city, village or incorporated town collected by its system; and for such purpose the sanitary district may extend its drains, ditches or sewers to connect with the sewage system of such city, village or incorporated town." 70 ILCS 2605/7d (West 2010) (added by 1959 Ill. Laws 1701-02 (§ 1)).

---

[3]The legislature amended section 19 only once, in 1907, and that amendment affected only the language of the notice provision. See 70 ILCS Ann. 2605/19, Historical & Statutory Notes, at 441 (Smith-Hurd 2005).

Again, the legislature did not amend section 19 to provide a cause of action with regard to the exercise of the additional powers granted to the District in section 7d of the Act.

¶ 31    When the legislature amends one statutory provision, but not another, it is presumed to have acted intentionally. See *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174-75 (2009). Accordingly, in this case, we can presume that when the legislature amended section 7 in 1921 and in 1959, it intentionally did not amend section 19 to allow property owners to recover for flooding caused by anything other than construction of the main channel.

¶ 32    A similar amendment was made to section 26 of the Act. When originally enacted, that section required any municipality in the District's service area that owned a system of waterworks and supplied water from a lake or other source that was saved from pollution by "the construction of the main channel, drain, ditch, or outlet," to furnish drinking water to any municipality that did not own a system of waterworks. See 1889 Ill. Laws 136. After the District began treating wastewater, section 26 was amended and the phrase "main channel, ditch, drain or outlet" was deleted and replaced with "by the construction of the sewage facilities provided by this Act." Now see 70 ILCS 2605/26 (West 2010). As with section 7 of the Act, the legislature did not amend section 19 after it amended section 26 to provide a cause of action with regard to the exercise of the District's new powers of wastewater treatment and intercepting sewer construction. We can presume that the legislature intentionally did not do so, thereby demonstrating that the legislature did not intend section 19 to allow property owners to recover for sewage backup and flooding caused by instances of heavy rainfall. Instead, section 19 was solely intended to compensate downstream property owners for flooding caused by construction of the main channel and reversal of the Chicago River.

¶ 33    Moreover, adopting Cicero's construction of section 19 could create potentially unlimited liability for the District. Because section 19 imposes strict liability, holding that the Act provides a right to be free from flooding and backup sewage and that the District can be sued under section 19 when its alleged failure to accurately anticipate instances of heavy rainfall causes flooding damage would effectively make the District an insurer of the public's real and personal property. In construing a statute, we presume that the General Assembly, in its enactment of legislation, did not intend absurd, inconvenient or unjust results. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 12 (2009).

¶ 34    Cicero nevertheless urges us to ignore decisions such as *Gentleman* and *Green* because the court in those cases could not "have taken into account the current state of [the District's] knowledge, experience, equipment and improvements." Instead, Cicero claims that we should follow the Second District's decision in *Pineschi*. In that case, the plaintiff alleged that the Rock River Reclamation District performed maintenance on a subdivision's sewer system which altered the flow of water and caused black water and fecal matter to back up into the plaintiff's lot and the basement of his home. *Pineschi*, 346 Ill. App. 3d at 720. The plaintiff, among other things, sought damages under section 19 of the Act and the trial court ultimately entered a default judgment against the defendant. *Pineschi*, 346 Ill. App. 3d at 721. The defendant's motion to vacate that judgment was denied and, on appeal, the appellate court affirmed that denial with respect to the claim for damages under section 19 and held that the defendant had not established that it had a meritorious defense to the count

based upon that section. *Pineschi*, 346 Ill. App. 3d at 725. The court reasoned that when the defendant's agents cleared the sewer main by pumping water into it, restoring the flow of water, they were " 'using' " the sewer system and were also restoring it to its full normal " 'use.' " *Pineschi*, 346 Ill. App. 3d at 725. The court further reasoned that to accept the defendant's argument that section 19 did not apply because the damage resulted from "repair" of the sewer would "arbitrarily deny a landowner the right to recover for harm that is essentially indistinguishable from other harm that is compensable." *Pineschi*, 346 Ill. App. 3d at 725-26.

¶ 35 First, *Pineschi* is factually distinguishable from the present case. In *Pineschi*, the plaintiff sought damages for an affirmative act by the defendant municipality, whereas in this case Cicero seeks damages based upon the District's alleged failure to act. As discussed above, we find that section 19 does not provide a cause of action for damages allegedly caused by the District's failure to anticipate the need to use its systems to prevent flooding. Further, the District notes that the court in *Pineschi* applied the wrong statute to the Rock River Water Reclamation District (Rock River). The District is the only Illinois sanitary district organized under the Act, whereas Rock River was organized and continues to operate under the Sanitary District Act of 1917. See 70 ILCS 2405/1 *et seq.* (West 2010). As Rock River was not organized under the Act, the court's application of section 19 in *Pineschi* is questionable.

¶ 36 Next, the above distinguishing factors aside, as we hold that section 19 does not provide a cause of action herein, *Pineschi* conflicts with our holding in this case. That decision is not binding on this court and we decline to follow it. See *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2 (2005) (appellate court opinions are not binding on other branches of the appellate court, and a court is not bound to follow a decision of an equal or inferior court).

¶ 37 Cicero next contends that the trial court erred when it dismissed count I of its complaint, which was titled as a claim for "accountability." Cicero claims that the court failed to look beyond the title of this count and to consider the substance of the allegations and relief sought therein. We disagree.

¶ 38 Cicero acknowledges that after the trial court dismissed count I of the complaint, Cicero incorporated the allegations and request for equitable relief in that count into count II of the amended complaint. In dismissing count II of the amended complaint, the trial court reviewed the substance of all of the allegations made by Cicero as well as the statutory provisions Cicero relied upon as a basis for its request for equitable relief. Thus, contrary to Cicero's argument, the trial court did look beyond the title of count I and considered the substance of Cicero's claim for equitable relief.

¶ 39 Cicero contends that the court erred when it dismissed count II of its amended complaint, which sought equitable relief in the form of a permanent injunction. In count II, Cicero requested that the trial court order the District to properly anticipate heavy rainfall, to implement and activate procedures for handling excess stormwater before backup flooding occurred, and to create a communication system with Cicero so that it could be kept informed of the threat of heavy rainfall and so that the District and Cicero could coordinate efforts to prevent backup flooding.

¶ 40     A mandatory injunction is an extraordinary remedy that is not favored by the courts. *Lewis E. v. Spagnolo*, 186 Ill. 2d 198, 234 (1999). A party seeking injunctive relief "must demonstrate: (1) a clear and ascertainable right in need of protection; (2) that he or she will suffer irreparable harm if the injunction is not granted; and (3) that there is no adequate remedy at law." *Kopchar v. City of Chicago*, 395 Ill. App. 3d 762, 772 (2009). Additionally, the issuance of a permanent injunction is contingent on the plaintiff prevailing at trial on the merits of its claim. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 431 (2004).

¶ 41     Cicero's claims for injunctive relief are not based on a tort theory of liability.[4] Instead, they are based exclusively upon the Act. Cicero claims that its request for injunctive relief was improperly dismissed because public and private owners and occupants of real property in Cicero have a clear and ascertainable right to use and enjoy their property free from interference from backup sewage flooding. Cicero asserts that this right is derived from the Act and that injunctive relief is the only remedy available to compel the District to communicate with it in order to coordinate efforts to prevent backup sewage flooding.

¶ 42     We find that count II of the complaint was properly dismissed because the Act does not provide Cicero with a cause of action underlying its claims for equitable relief. We initially note that Cicero does not cite any statute or other authority in support of its claim that it has the right to have the District communicate or coordinate with it to prevent backup sewage flooding. And although Cicero claims that the right to be free from backup sewage flooding is derived from the Act, it cites the Act in its entirety as support for this proposition. Cicero also briefly discusses several sections of the Act without explaining how those sections, either individually or cumulatively, confer upon it the right to be free from backup sewage flooding. These general statements, without a reasoned argument or analysis, are insufficient to satisfy the requirements of Supreme Court Rule 341(h)(7). See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (a point raised but unsupported by argument is waived); *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 854-55 (2007) (a point raised but unsupported by reasoned argument fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is therefore waived).

¶ 43     Moreover, there is no right or cause of action underlying Cicero's request for equitable relief. Cicero requests a permanent injunction ordering the District to set up a communications system so that it can communicate and cooperate with Cicero in order to anticipate instances of heavy rainfall and prevent backup sewage flooding. However, this portion of the claim fails because Cicero does not allege that it has a right that entitles it to communication and coordination with the District or a recognized cause of action for the District's alleged failure to engage in such communication.

¶ 44     Additionally, as we have already held, section 19 of the Act does not provide Cicero with the right to be free from backup sewage flooding. Cicero's claim that this right is provided

---

[4]Without deciding the issue, we note that the "public duty rule" would appear to bar any such claims. See *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345 (1998) (stating that under the public duty rule, a public entity may not be "held liable for their failure to provide adequate governmental services").

by sections 3, 7 and 12 of the Act is without merit. Section 3 of the Act states that "[b]y reason of the importance and character of the services performed by the sanitary district, there is a great need and it is in the public interest that such services be performed in as near a non-partisan character as possible." 70 ILCS 2605/3 (West 2010). Section 7 of the Act gives the District the power to provide for the drainage "of both surface water and sewage, by laying out, establishing, constructing and maintaining one or more channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary ***; and may lay out, establish, construct and maintain, or provide for the laying out, establishing, constructing and maintaining of sewage disposal and treatment plants and works, within or without the territorial boundaries of such sanitary district." 70 ILCS 2605/7 (West 2010). Finally, section 12 authorizes the board of commissioners to levy taxes for corporate purposes. 70 ILCS 2605/12 (West 2010). We find that none of these sections provides Cicero with an underlying cause of action or a right to be free from backup sewage flooding.

¶ 45    Cicero appears to argue that because it has no underlying cause of action, a permanent injunction is the only way to compel the District "to do its duty under the Act to prevent backup sewage flooding." Cicero's argument misapprehends the nature of equitable relief and of the equitable remedy of a permanent injunction.

¶ 46    As previously noted, a party seeking a permanent injunction must first succeed on the merits. *Beretta U.S.A. Corp.*, 213 Ill. 2d at 431. This necessarily means that there must be a recognized cause of action underlying the request for injunctive relief and that the party seeking such relief must first prevail on the merits of that underlying cause of action. See 42 Am. Jur. 2d *Injunctions* § 18 (2010) ("a permanent injunction will be granted only when liability has been established"); Black's Law Dictionary 1003 (7th ed. 1999) (defining "merits" as "[t]he elements or grounds of a claim or defense"). A permanent injunction, however, is not a separate cause of action. *Walker v. Bankers Life & Casualty Co.*, No. 06 C 6906, 2007 WL 967888, at *4 (N.D. Ill. Mar. 28, 2007) (citing *Shell Oil Co. v. Richter*, 125 P.2d 930, 932 (1942) ("Injunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted.")). Instead, it is an equitable remedy that a court can provide when a party succeeds on the merits of its underlying cause of action but the available legal remedy is inadequate. See 42 Am. Jur. 2d *Injunctions* § 1 (2010) ("An injunction is not appropriate if a remedy at law can furnish the injured party with the full relief to which he or she is entitled."); 43A C.J.S. *Injunctions* § 13 (2004) ("[A mandatory injunction] will be issued only in cases of extreme, serious, great or urgent necessity, or in compelling circumstances, where the right invaded is material and substantial and where adequate redress at law is not afforded, or where the injury is not compensable in damages.").

¶ 47    In this case, there is no recognized cause of action underlying Cicero's request for injunctive relief and none is provided for by the Act. Therefore, Cicero cannot allege any facts upon which it could succeed in its underlying cause of action. Such success is necessary before the circuit court could grant injunctive relief, and for this reason as well we find that count II of Cicero's amended complaint was properly dismissed.

¶ 48                                    CONCLUSION

¶ 49        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 50        Affirmed.