2024 IL App (1st) 230582-U
No. 1-23-0582
June 14, 2024

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| ROBERTA RUDA, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21 L 7777 |
| | ) | |
| JEWEL FOOD STORES, INC., a foreign | ) | The Honorable |
| corporation d/b/a JEWEL-OSCO, | ) | Gerald V. Cleary, |
| | ) | Judge, presiding. |
| Defendant-Appellee. | ) | |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Hyman and C. A. Walker concurred.

**ORDER**

¶ 1        *Held*: Reversing the trial court's grant of summary judgment for the store in this slip-and-fall case, we find there were genuine issues of material fact regarding: (1) whether the dangerous condition existed for a sufficient amount of time such that it should have been discovered by the exercise of ordinary care, where there is a 2-hour gap in the store's sweep records due to a stipulation by the parties, and where the parties dispute on appeal whether the store's video shows that store employees are, or are not, looking at the floor as they work, and (2) whether the dangerous condition was part of a pattern of conduct or a recurring incident, where the depositions of defendant's employees establish that cherry pits on the floor was a recurring incident on the days when there was a cherry display in the store, such as on the day that plaintiff slipped on a cherry pit.

¶ 2        Plaintiff Roberta Ruda appeals the trial court's grant of summary judgment for

defendant Jewel Food Stores, Inc. Plaintiff slipped and fell in a Jewel Osco Store on Waukegan

Road in Deerfield and filed a complaint alleging one count of negligence against the store. For the following reasons, we reverse the trial court's grant of summary judgment for the store.

¶ 3                                    BACKGROUND

¶ 4        On August 2, 2021, plaintiff filed her complaint alleging that on May 29, 2021, she fell while shopping in the store. There is no dispute that plaintiff fell on that date while a customer in the store. The complaint alleged that plaintiff slipped on a cherry on the store's floor; and a store director later acknowledged that she did not bother to ask plaintiff how plaintiff fell since the director saw a cherry pit on the bottom of plaintiff's shoe. There is also no dispute that the store had a display with cherries for sale on that date.

¶ 5        The complaint alleged that defendant breached its duty of care in the maintenance of its premises to guard against foreseeable injuries to plaintiff and others. Although the complaint was not divided into individual counts, it further alleged: a failure to properly inspect the floor near the cherry display; a failure to remove pieces of fruit on the floor near the cherry display; allowing a dangerous condition to exist; a failure to remedy the dangerous condition by clearing the floor near the display; and a failure to warn, although it knew or should have known of a dangerous condition.

¶ 6        Defendant filed an answer in which it alleged as an affirmative defense that plaintiff was negligent in that she was inattentive, that she failed to observe and avoid open and obvious conditions, and that she failed to keep a proper lookout.

¶ 7        As part of its response to plaintiff's request to produce documents, defendant produced an "Incident Detail Report," authored by store director Tammy Stock, which stated that it was completed the same day as plaintiff's fall. Under "Incident Description," the report stated: "customer slipped on a cherry pit and fell on knee." "Customer Footwear Description" was

2

given as "walking shoes." "General description of substance allegedly slipped on" was given as "cherry pit." The report answered "yes" to the following two statements: "Store verify existence of substance" and "Substance appear slipped on."[1] The question "Who inspected area after incident?" was answered: "store director." The entry "Sweep Log Information" had a "No" by it. The entry "Employee [who] last conducted sweep" was left blank. The report noted that the fall did not occur on a "non-skid floor," that caution cones were not out, and that mats were not in place. The question "How did [the substance] get on floor/area" had the following answer: "customer ate a cherry and dropped [*sic*] on the floor." The store director later explained at her deposition that she was not referring in this particular entry to plaintiff but rather to a "customer" in general.

¶ 8          On February 16, 2022, defendant moved for summary judgment, with exhibits attached, including portions of various deposition transcripts, as well as photos, the store incident report and surveillance footage inside the store.

¶ 9          Jamie Ianson stated in her deposition[2] on September 27, 2022, that she was employed by defendant in customer service, specifically as the front-end manager of the store, that she was working at the store in question at the time that plaintiff fell, and that she had worked for defendant since graduating from high school in 2004, or almost 20 years.

¶ 10          At Ianson's deposition, plaintiff's counsel observed that the store incident report for this incident stated that a customer ate a cherry and dropped it on the floor. Counsel then

---

[1] This is a direct quote from the report, and it appears to ask: did the substance, which the store verified in the prior question, appear to have been slipped on? The author of the report answered that question "yes."

[2] The depositions taken here were discovery depositions, rather than evidence depositions. See Ill. S. Ct. R. 212 (describing the purposes for which discovery depositions may be used as opposed to evidence depositions). See also Ill. S. Ct. R. 202 and 206. In general, the purpose of a discovery deposition is to explore the facts of the case, while, in contrast, the purpose of an evidentiary deposition is to preserve testimony for trial, *In re Estate of Rennick*, 181 Ill. 2d 395, 401 (1998).

3

asked, even though Ianson had not authored the report, if Ianson had a reasonable belief where that information had come from, and Ianson replied yes. When asked, Ianson explained:

"Q. What is that reasonable belief?

A. That it happens all the time.

Q. Oh, so based on your experience?

A. Based on my experience, during—whenever there are cherries, customers eat them and spit them on the floor.

Q. Really?

A. Yes. All the time.

Q. Interesting.

So that's a common occurrence?

A. Yes."

Thus, according to Ianson, customers eat cherries and spit them on the floor all the time.

¶ 11        Ianson stated that, at the time of plaintiff's fall, the store had in place a "sweep program," to ensure the removal of debris from the floor. She stated that "every hour somebody goes through and checks to make sure that there's no debris on the floor." She explained that someone does not actually sweep the entire floor, but rather someone walks the aisles and picks up what he or she spots.

¶ 12        Ianson stated that, although she did not witness plaintiff fall, she was notified of the fall through a radio broadcast which she heard through a headset she was wearing, and she walked over to the produce department where the fall had occurred. When Ianson arrived, her store director, Tammy Stock, was already there. Ianson observed plaintiff on the floor in a fetal position and a shopping cart that was 5 or 6 feet away, Stock asked Ianson to take photos, and

4

Ianson took photos on her cell phone. Five print copies of these photos were identified at Ianson's deposition and marked as a group exhibit. Ianson agreed that Photo A showed plaintiff and the paramedics's gurney, that Photo B showed a dark spot directly under plaintiff's left shoe, that Photo C also showed a spot right under plaintiff's left shoe and another spot above and in line with the toe of her left shoe, that Photo D showed plaintiff holding her phone and a dark spot under her right foot, and that Photo E depicted the shopping cart, showing what was in the cart. When asked to look at the photo of the cart and to recite what produce she observed, Ianson stated: "Strawberries, corn, cherries, watermelon, cantaloupe, and honey dew." Ianson estimated that it took her 15 seconds to take all five photos.

¶ 13 At her deposition, plaintiff's counsel asserted that he was showing Ianson two photos that were taken when plaintiff was at the hospital and that showed residue on the bottom of plaintiff's shoe. Ianson stated that she observed the residue in the photos. However, Ianson agreed that she had not observed that residue on the shoe when Ianson was at the scene, because Ianson had not looked at the bottom of plaintiffs' shoes.

¶ 14 Tammy Stock stated in her deposition on June 7, 2022, that she was the store director[3] and the one who answered the interrogatories on behalf of defendant, and that she had worked for defendant for 10 years. Stock stated that clerks "sweep" the floors every hour. She explained that, by the word "sweep," she did not mean "physically sweep," but rather visually survey the floors and clean when needed. Stock noted that, while "working tables," the clerks were also expected "to maintain the floors as well" and clean when needed. Mike Sarno was

---

[3] Stock explained that the term "store director" was the same as what used to be called the "store manager."

the produce manager and, at the time of the fall, there would also have been three produce clerks in the produce department.

¶ 15    Stock stated that she first became aware of plaintiff's fall when Sarno, her produce manager, called her on her radio. When Stock arrived in the produce section, she observed plaintiff on the floor holding her leg. After asking plaintiff if she wanted medical assistance, Stock called for paramedics right away. When asked about plaintiff's condition, Stock stated "[s]he was in pain." Stock explained that she did not ask plaintiff how plaintiff fell because: "There—there was a cherry pit on her shoe, so I didn't have to ask her.' Stock confirmed that Stock observed the cherry pit on plaintiff's shoe and asked Ianson to take a picture of the shoe. Stock also noticed that plaintiff had cherries in her cart, but Stock did not observe plaintiff drop a cherry and did not hear anyone say that they had observed plaintiff drop a cherry. Stock stated that the display with cherries was approximately 25 feet away from where plaintiff fell. Plaintiff's counsel asked if, "in any of what you have either seen or read before your deposition, is there any indication to you that [plaintiff] was eating those cherries and just—or dropping them on the floor?" and Stock said "No."

¶ 16    Stock stated that the marking or redness on the ground depicted in Photo B indicated the location of the cherry pit. Stock agreed that the presence of cherries in plaintiff's cart did not mean that plaintiff was eating the cherries, and any belief that plaintiff dropped cherries would be speculation. Plaintiff's counsel stated that he had been provided with "the sweep log" from that date and he showed it to Stock. Stock agreed that the log showed that L.R.[4] clocked in his "sweep" of the produce section at 13:05:16 (or 1:05:16 p.m.). Stock explained

---

[4] Because L.R. is a challenged employee, the parties stipulated that L.R. would not be called as a witness. See *supra* ¶ 30. To protect his privacy, we use his initials.

that a clerk would clock in the task after having first completed it. Less than 20 seconds later, at 13:05:34, L.R. clocked in his "sweep" of the grocery department, which Stock explained was "right next to produce," approximately "2 feet" away. To clock in, LR. had to use the "time clock up front" in the store. The next time L.R. clocked in was approximately an hour later, at 14:05:25, and that was again in the produce section. If there was nothing on the floor, Stock estimated that it would take L.R. five minutes to "sweep" both the produce and grocery areas.

¶ 17        Stock acknowledged that she prepared the incident report after plaintiff left the store and sent it to defendant's risk management department. Stock also acknowledged the various entries that she made on the form, which we already described above. Stock explained that, where her report stated that a customer had dropped a cherry pit on the floor, Stock was not referring to plaintiff. Stock clarified:

> "The cherry pit was on the floor, and a customer had to have eaten it and put it on the floor. [The report] doesn't necessarily state it was that customer, but someone ate it and put it on the floor."

When asked whether there was a pit or a cherry on the floor, Stock answered that there was definitely not a whole cherry on the floor, because a whole cherry "would've made a big mess." After plaintiff was removed from the store, Stock did not speak to L.R., Sarno or any of the other employees working in the produce department that day, and she did not ask L.R. whether he had swept the aisle where plaintiff fell. Stock agreed that, on the store video of the incident that she watched, Sarno was within a few feet of where plaintiff fell, but his back was turned to her.

¶ 18         On cross, Stock testified that she saw plaintiff weekly in the store and plaintiff was "walking well," but Stock had not spoken to her since the incident. Plaintiff's daughter came to the store the morning following the incident and said that her mother had surgery and that she (the daughter) wanted to leave her contact information. After the incident, plaintiff said that her knee hurt. On recross, Stock agreed that there is always some fruit that is not perfect when it is packaged, and that a cherry could have been crushed in the bag. Stock agreed that, after watching the video and discussions with Sarno and Ianson, Stock had not determined who put the cherry pit on the floor. At the end of her deposition, Stock waived the right to review the deposition transcript and sign it.

¶ 19         Mike Sarno stated at his deposition on June 7, 2022, that he had worked for defendant for 32 years and had been the produce manager at this particular store for five years. Other than a few part-time jobs in high school, Sarno stated that working for defendant "has been what I've been doing my entire life." Sarno stated that, at the time of plaintiff's fall, he was close by, but he had his back to her and he turned around when he heard her scream. When asked what she had fallen on, he replied:

> "I saw that she fell and I was, you know, trying to see how she was, and then I did—I did after looking down, we did notice a cherry pit on the floor, just a cherry pit with some flesh that was still on it, so it looked like it was recently a newer cherry pit. It wasn't something that had been sitting there for a while because it looked pretty fresh."

¶ 20         After plaintiff fell, Sarno contacted his supervisor, Tammy Stock, on the intercom, asking her to come over to the produce department because a customer had fallen. Plaintiff "said something about her knee." Sarno did not look at the bottom of plaintiff's shoe. Sarno assumed someone must have picked up the cherry pit, because he saw it after plaintiff fell and,

when plaintiff left with the paramedics, it was no longer there. Sarno then cleaned the area where it had been.

¶ 21     Sarno stated that, every hour, the store has "a sweep walk," and that if he or his clerks notice a spill, they clean it up immediately. Looking at a photo of a red mark on the floor underneath plaintiff's shoe, Sarno said that it did not appear "to be a crush of a cherry like someone stepped on it." Sarno explained that, "if it was a whole cherry there would be juice everywhere." When asked what his belief was about the cherry, Sarno answered "someone ate it probably." Sarna said there was a "good possibility" that someone ate it and spit the pit on the floor. The bags of cherries come pre-packaged, and Sarno has never seen a pit or a crushed cherry inside the bag.

¶ 22     Sarno stated that, when he stacks the bags of cherries, the bags are not always sealed:

"Q. So when you stack the bags, are those bags sealed?

A. Not all the time.

Q. I'm sorry.

A. Sometimes we'll spin them once or twice to like fold them over or whatever, but the customers will open them to pick out what they want so they never really stay closed, but, no, like they're never all closed at one time when they are on display."

Prior to these questions, Sarno stated that there was no way of aerating the cherries other than by opening the zip lock at the top of the bag.

¶ 23     Sarno stated, after plaintiff fell, Stock called 911. From where plaintiff fell, it was about 40 to 50 feet from the cherry display Later, Sarno stated that it could be 50 to 60 feet, but that was "just a guesstimation." Looking at a photo of a substance on the bottom of plaintiff's shoe,

Sarno stated: "It does not look like a cherry to me." At the end of the deposition, Sarno waived the right to review and sign his deposition.

¶ 24    Plaintiff stated at her deposition on April 5, 2022, that, prior to this incident, she had shopped at this store once or twice a week for five years. On the day of the incident, she arrived at the store at approximately 1:50 p.m. and took a shopping cart. She was in the store for 10 or 15 minutes before she fell, and in the produce department specifically for only a minute or two before her fall. Prior to her fall, she recalled putting three melons into her cart, but did not recall putting any other produce in it. Defense counsel specifically asked if she put a bag of cherries into her cart, and she said no. Plaintiff had previously seen items on the floor of the produce department at other times when she had shopped at that store but she did not notice anything on the floor on this visit prior to her fall. However, plaintiff was looking straight ahead, as she pushed her cart. While walking around, she did not eat any cherries or any other produce.

¶ 25    Plaintiff recalled that the cherries were in bags on "a stationary display case," which was a square table with other fruit. The cherries were Bing cherries, and some bags on the table were closed and some were open. Immediately before her fall, plaintiff was walking and holding her shopping cart with both hands, when she felt something under her foot that felt "squishy or slippery" and she fell to her knee and then fell backwards. Plaintiff felt something under her root foot, and she fell on to her right knee, and she fell back onto her left side and lay "head to toe" on the ground. Plaintiff stated that it was a cherry that caused her fall. When she stepped on the cherry, the cherry display was immediately to her left side, approximately a foot away. The first time that plaintiff observed the cherry pit was when the paramedics

arrived approximately 10 minutes later and they pointed it out to her, lying in the aisle. Plaintiff did not know how long the cherry was on the floor or how it got there.

¶ 26        Plaintiff recalled that, after she fell, she was in excruciating pain and was screaming for someone to call an ambulance. The first person who arrived to help her was a woman employee, who arrived approximately five minutes later. The employee asked plaintiff if plaintiff needed help getting up, and plaintiff asked her to call an ambulance. The employee asked plaintiff what had happened, and plaintiff replied that she was in terrible pain and could not move her leg, and that she had slipped and fallen on something. After the fall, plaintiff was in the store for another 15 minutes. During that time, plaintiff used the cellphone in her purse to call her sister. Looking at photos, plaintiff identified the cherry pit that she had seen.

¶ 27        Counsel asked if her shopping cart was depicted in one of the photos, and plaintiff said she did not know. When asked if that is where her cart "would have likely been" after her fall, plaintiff said no. When asked if the cart is in the photo was near where her shopping cart "would have been," plaintiff replied: "It could be." Plaintiff does not recall whether someone moved her cart and does not know if someone did. Eventually, plaintiff stated that the cart depicted in photo 2E was "probably" her shopping cart. She agreed that the photo of the cart showed a sanitation wipe in the basket, three containers of precut melons, a package of corn on the cob, a package of whole strawberries and an open bag of cherries. Plaintiff stated that she did not remove or drop any of the cherries out of the bag before her fall.

¶ 28        From her medical providers, plaintiff knows that the fall injured her right knee, that her patella tendon was severed, that her kneecap was fractured and that they removed five pieces of her kneecap. In addition, the wound opened, and there was possible contamination and infection. Prior to her fall, she did not have any pain, problems or arthritis with her right knee.

11

Approximately thirty years ago, she was diagnosed with osteopenia. Plaintiff identified photos taken in the emergency room that showed cherry flesh on the bottom of her shoe. After being taken first by ambulance to the emergency room at Highland Park Hospital, she was taken next by ambulance to Skokie Hospital, because it was an orthopedic hospital, and that is where she had surgery. The surgeon later told her that. to reattach her tendon, he removed five pieces of her kneecap, and that she had only two-thirds of her kneecap left. After the surgery, she was in the hospital for several days, and at a skilled nursing facility for six weeks. For three months, she was in a knee immobilizer, and for six months she used a walker. She also needed wound care and home health care for a couple of months. Plaintiff was still in physical therapy two days a week for her right knee at the time of the deposition. The therapy started after she was out of the immobilizer. Since the surgery, she also received gel injections and steroid injections in her right knee. Although her pain level is okay when she is sitting, the pain is "there all the time." She said: "Just about everything you do in your daily life is compromised now." Plaintiff also waived her signature for the deposition.

¶ 29        In addition to deposition transcripts, defendant's motion included the five photos taken by Ianson shortly after plaintiff's fall, which were already described above (*supra* ¶ 11), and a video clip from the store surveillance video camera. The video clip starts at 1 p.m. on Saturday May 29, 2021, and shows plaintiff walking around the store, prior to the incident.

¶ 30        Plaintiff's response to defendant's motion for summary judgment included photos, a stipulation and defendant's sweep log. The relevant content of the sweep log was already described above (*supra* ¶ 15). Although entitled "Stipulations," the document is one short page and states:

"It is hereby stipulated by and between the parties hereto that:

12

1. No Party will call [L.R.] at trial and/or arbitration as a witness;

2. No Party will present any evidence that on the date the Plaintiff fell, [L.R.] swept the specific aisle in which the Plaintiff fell before she fell, regardless of whether [L.R.] is named or unnamed in such evidence."

The evidence in which L.R. is "named" is the sweep log.

¶ 31 On March 2, 2023, the trial court granted summary judgment for defendant in a five-page written order. The court found that "plaintiff failed to present evidence to create a question of fact that [defendant] caused the condition, that [defendant] had actual notice of the condition or that [defendant] had constructive notice of the condition." The order did not address the foreseeability or failure to warn allegations raised by plaintiff in her complaint. The court found that there was no evidence regarding how long this particular cherry or cherry pit was on the ground prior to plaintiff's fall. The trial court further found that an appellate court case that plaintiff relied on was "overruled" by another appellate court case.[5]

¶ 32 On March 30, 2023, plaintiff filed a notice of appeal, and this timely appeal followed.

¶ 33 ANALYSIS

¶ 34 I. Standard of Review

¶ 35 Plaintiff appeals the trial court's grant of summary judgment in favor of defendant. Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmovant, shows there is no genuine issue as to any material fact, thereby entitling the moving party to judgment as a matter of law. *Zurich American Insurance Co. v. Infrastructure*

---

[5] "A decision of our appellate court may only be reversed or overruled by [the supreme court]." *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2 (2005). An appellate court is "free to part company" with the decision of another panel, "but as a court of equal dignity it had no authority to 'abrogate that decision." *Gillen*, 215 Ill. 2d at 392 n.2.

*Engineering, Inc.*, 2023 IL App (1st) 230147, ¶ 17; 735 ILCS 5/2-1005(c) (2022) ("there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law").

¶ 36 "Summary judgment is a drastic means of disposing" of a lawsuit (*Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12), and it should be utilized only when the movant's right to judgment is clear and free from doubt. *Zurich*, 2023 IL App (1st) 230147, ¶ 17. "A plaintiff who opposes summary judgment need not prove his case, but must provide some factual basis which could arguably result in a favorable judgment." *Brown, Udell and Pomerantz, Ltd v. Ryan*, 369 Ill. App. 3d 821, 824 (2006). By contrast, the opposing party must produce competent, admissible evidence which, if proved, would warrant entry of judgment for it. *Brown*, 369 Ill. App. 3d 821, 824 (2006).

¶ 37 A genuine issue of material fact exists where any material fact is disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts. *Carrey v. Union Pacific Railroad Co.*, 2016 IL 118984, ¶ 25.

¶ 38 On appeal, a reviewing court will consider *de novo* the trial court's decision to grant summary judgment. *Zurich*, 2023 IL App (1st) 230147, ¶ 17. *De novo* review means that we perform the same analysis that a trial court would, and that we owe no deference to the trial court's decision. *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 25.

¶ 39                                    II. Constructive Knowledge

¶ 40 In the case at bar, plaintiff seeks recovery based on defendant's alleged negligence. To recover, plaintiff must plead and later prove: (1) a duty owed by defendant to plaintiff, (2) a breach of that duty, and (3) an injury proximately resulting from that breach. Ca*rney v. Union*

*Pacific Railroad Co.*, 2016 IL 118984, ¶ 26. On this appeal, only the second element, the breach is disputed.

¶ 41    Liability may be imposed upon a business when a business invitee is injured after slipping and falling on the business's premises, if the invitee can establish that the business had actual or constructive notice of the dangerous condition causing the fall. *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 651 (2014) (citing *Culli v. Marathon Petroleum Co.* 862 F.2d 119, 123 (7th Cir. 1988) (citing Illinois cases)). Plaintiff concedes in its brief to this court that defendant did not have actual notice.

¶ 42    Under Illinois law, a plaintiff may establish constructive notice by showing evidence either (1) that the dangerous condition existed for a sufficient amount of time such that it should have been discovered by the exercise of ordinary care, or (2) that the dangerous condition was part of a pattern of conduct or a recurring incident. *Zuppardi*, 770 F.3d at 651; *Nicholson v. St. Anne Lanes, Inc.*, 136 Ill. App. 3d 664, 668-69 (1985). See also *Swartz v. Sears, Roebuck & Co.*, 264 Ill. App. 3d 254, 274 (1993) (constructive notice came from "defendant's awareness of the potentially dangerous recurring situation"). Applying those prongs to the facts at bar would require plaintiff to show either (1) that this particular pit was likely on the floor for a sufficient amount of time such that this pit should have been discovered in the exercise of ordinary care, or (2) that the recurring incidence of cherry debris on the floor, in the wake of a cherry display, created a dangerous condition that the store failed to adequately address.[6]

---

[6] For example, in *Perminas v. Montgomery Ward & Co.*, 60 Ill. 2d 469, 471-72 (1975), the court noted that a business is liable for the negligent acts of third parties if the business fails to take reasonable care to discover such acts are being done or to give adequate warning, and that a business is also liable if an invitee is injured as the result of a dangerous condition created by a particular method of displaying merchandise, if the creation of the dangerous condition was reasonably foreseeable.

¶ 43    Regarding the first prong, plaintiff argues that there is a two-hour gap, which we discuss below. See *Newson-Bogan v. Wendy's Old Fashioned Harmburgers*, 2011 IL App (1st) 092860, ¶ 19 ("when plaintiff testified that she observed no one inspecting the area for 20 minutes, that testimony is sufficient to create a triable issue of fact as to constructive notice" about grease on the floor of a restaurant); *Tafoya-Cruz v. Temperance Beer Company*, 2020 IL App (1st) 190606, ¶ 78 (summary judgment on the issue of constructive notice was not appropriate where a plaintiff testified that no employee did a walk-through for 20 minutes).

¶ 44    Regarding the second prong, plaintiff argues that defendant had a duty "to protect its customers from this constant problem of which it was also aware of customers throwing cherry pits on the floor." The depositions of defendant's employees indicate that cherry pits on the floor was a recurring incident on the days when there was a cherry display, such as on the day of plaintiff's fall. Ianson, an employee with almost 20 years of experience with defendant, stated that cherries on the floor happen all the time. Stock, the store director assumed, as a matter of course, that the cherry pit on the floor came from a customer who ate a cherry and spit out the pit. Similarly, Sarno stated that cherry pits on the floor "usually" came from "someone eating it and spitting it onto the floor."[7] Despite the fact that long-term employees were aware of the incidence of cherry debris, the incident report indicated that there were no mats or non-skid floors, and Sarno stated that, when he stacked bags, some were open. Although Sarno stated that the cherries arrive at the store in sealed ziplock bags, when asked if they were sealed when "you" stack them, he replied "[n]ot all the time." The store did have "sweep" policies in place, which we discuss in more detail below.

¶ 45                                    III. The Record

---

[7] Sarno also later stated "in my experience, someone ate the pit and spit it out on the floor."

¶ 46        The record before us consists largely of deposition transcripts of defendant's employees. "A statement by an employee is admissible against the employer as a party admission if it is made during the existence of the employment relationship and concerns matters within the scope of the employment." *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 185 ("In addition, statements made by a party's agent about a matter within the scope of his or her agency and by virtue of the agent's authority are party-opponent admissions."). Generally, an employee's knowledge of a dangerous condition is considered sufficient to impute notice to a defendant employer, since an employee has a responsibility to correct or report the problem. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1066 (2001).

¶ 47        Defendant argues, and we agree, that it is well established that any evidence which would be inadmissible at trial cannot be considered by the court in support of, or in in opposition to, a motion for summary judgment. *CCP Ltd. Partnership v. First Source Fianncial, Inc.*, 368 IL App. 3d 476, 484 (2006); *Brown*, 369 Ill. App. 3d 821, 824 (2006). This is true even if the other party failed to object. "Given the purpose of summary judgment, a party's failure to object when the other party cites clearly inadmissible facts or opinions does not mean that the trial court must accept those facts or opinions and set the case for trial if they create issues of material fact." *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 89. Since we perform the same analysis as the trial court, the same is true on appeal. As defendant quoted for us in its appellate brief, "[i]t would be a disservice to both the parties and the judicial system as a whole if the court were to base its summary judgment ruling on inadmissible evidence." *Essig*, 2015 IL App (4th) 140546, ¶ 89.

¶ 48     In the case at bar, the parties have stipulated that certain evidence is inadmissible. The parties stipulated that no one will call L.R. as a witness and that no party "will present any evidence that on the date the Plaintiff fell, [L.R.] swept the specific aisle in which the Plaintiff fell before she fell, regardless of whether [L.R.] is named or unnamed in such evidence." Thus, defendant stipulated that it will not "present any evidence" that L.R. swept that aisle "regardless of whether L.R. is named *** in such evidence." The evidence in which L.R. is named is the sweep log, thus making that evidence inadmissible as evidence of sweeping during the relevant time period and creating a two-hour gap.

¶ 49     Defendant, for its part, argues that there is not a two-hour gap, because others in the area also had an obligation to clean up debris, if they noticed it. However, that does not change the fact that there is a two-hour gap in the procedure instituted specifically by defendant to address debris on the floor, which defendant's employees indicated was foreseeable in the wake of a cherry display. Defendant argues in response that such a statement means that its safety procedure is being held against it. However, by making this observation, we are not holding defendant's procedure against it, but rather noting that defendant cannot use this procedure as a shield or defense against plaintiff's allegations of foreseeability, if it cannot prove the procedure.

¶ 50     Plaintiff argues that the video surveillance footage captures several instances where employees do not check the floor around them, as they walk through the store performing specific tasks such as stocking shelves and talking to other customers and employees. Although Sarno, for example, testified that he is "always looking at the floors," plaintiff argues that the video footage shows that he did not look at the floors, as he moved around the produce area, stocking produce and talking to customers. In the few seconds before plaintiff's fall, the

video shows Sarno turn into the aisle and reach for an item on a shelf, and then return to the intersecting aisle, without appearing to look down.

¶ 51    In response, defendant argues that it is impossible to determine from the video where a person's eyes are focused and that it is "common knowledge" that a person can look ahead and to the ground without bending their head. Whether this argument would or would not persuade a jury is not up to us to say, but it still creates a material issue of fact and credibility. *Carney*, 2016 IL 118984, ¶ 25 (a genuine issue of material fact exists where reasonable people might draw different inferences from undisputed facts).

¶ 52    In granting summary judgment to defendant, the trial court relied on *Tafoya-Cruz*, 2020 IL App (1st) 190606, in which the appellate court affirmed a trial court's grant of summary judgment to a defendant business in a slip and fall case. However, the *Tafoya-Cruz* case is distinguishable legally and factually from our case.

¶ 53    First, *Tafoya-Cruz* is distinguishable legally because the recurring nature of the danger was simply not an issue in that appeal. The appellate court noted that plaintiff failed to cite relevant supporting cases, such as *Perminas v. Montgomery Ward & Co.*, 16 Ill. App. 3d 445 (1973) (liability based on a recurring incident "is a valid principle of law"), *rev'd on other grounds by* 60 Ill. 2d 469 (1975),[8] until its motion to reconsider. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 85. Thus, the reviewing court refused to consider that prong of the constructive notice doctrine, finding it forfeited. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 86.

¶ 54    By contrast, in the case at bar, plaintiff cited *Perminas*, both the appellate court case and the subsequent supreme court case, in her initial response to defendant's summary

---

[8] The *Tafoya-Cruz* court cited the appellate court opinion in *Perminas*, without noting that there was a subsequent supreme court opinion that reversed on other grounds. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 85 (citing only *Perminas*, 16 Ill. App. 3d).

judgment motion. Based on it and other cases, she argued that the trial court must consider "whether a foreign object is known to the business to cause a dangerous condition" and "the likelihood of the dangerous condition." In her timely response to defendant's motion, plaintiff noted that, in *Perminas*, constructive notice was inferred where a store knew of a dangerous condition "often" created by customers and yet failed to take reasonable steps to address the danger. The trial court discussed plaintiff's argument in its written order and stated that it found *Perminas* distinguishable because the store in *Perminas* "had actual knowledge that the objects were being misused as skateboards and left in the aisle." This is a distinction without substance because, in the case at bar, defendant similarly had actual knowledge that customers were eating cherries and spitting pits on the floor, all the time. In any event, plaintiff's timely argument and the trial court's discussion of it in its order establish that this issue was not forfeited, as it was in *Tafoya-Cruz*, and, thus, *Tafoya-Cruz* is legally distinguishable from ours.

¶ 55     Factually, the differences are even more extreme. *Tafoya-Cruz* case is to ours, as night is to day. The opening line of the *Tafoya-Cruz* opinion states: "After a day spent drinking beer and fixing cars at his auto-repair shop, [the plaintiff] went to a craft brewery in Evanston, Illinois, defendant Temperance Brewing Company, where he continued drinking." *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 1. Compare that opening sequence of events to the sequence in our case, where plaintiff was in a grocery store, in the middle of the afternoon, holding her shopping cart with both hands, with no suggestion of prior alcohol impairment. In addition, although the manager at the brewery could not specifically recall when he had last checked the bathroom, which was the scene of the fall, he testified that, usually, he personally checked it every 30 minutes. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 64. By contrast here, due to the stipulation, there is no one who can testify as to when he did, or did not, personally check the

floor. Further, in *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 66, this court observed that there was no testimony about what the alleged substance was and, particularly, no testimony about the substance from plaintiff. By contrast, even defendant's employees here talked about the cherry pit. The store director stated that she did not have to ask plaintiff what caused the fall because the director could see for herself the cherry pit. Stock stated: "there was a cherry pit on her shoe, so I didn't have to ask her.' Because of the considerable factual and legal differences from our case, *Tafoya-Cruz* is not dispositive, even if we found it persuasive.

¶ 56 Defendant and the trial court relied on *Tafoya-Cruz*, in part, for the proposition that a retail establishment's safety procedure should not be held against it, otherwise that could encourage retailers not to have one. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 75. However, in this appeal, the foreseeability of the alleged danger was already well established by employee depositions, and the question is more whether the store can rely on its procedure as a defense or shield to allegations of foreseeability.[9]

¶ 57 In sum, we cannot find, under *de novo* review, that defendant was entitled to summary judgment as a matter of law, where only the element of breach was at issue; where the depositions of defendant's own employees establish that, to people like themselves who are in the grocery business, the alleged hazard, namely, cherry debris on the floor, was readily forseeable; where its produce manager stated that, when he stacked the cherry bags, they were not always sealed; where the store's incident report indicates other measures that were not taken, such as non-skid floors or mats; where, due to a stipulation, there is a two-hour gap in the sweep procedure established by defendant, thereby rendering the procedure a weak shield

---

[9] Plaintiff argued in its brief to this court that defendant's internal policies "become a relevant factor where other facts prove foreseeability by the defendant of the dangerous condition," which was the recurrent incidence of cherry debris when there is a cherry display.

against allegations of foreseeability;[10] and where the parties on appeal spent portions of their appellate briefs disagreeing about the inferences to be drawn from a video concerning whether employees, other than the designated "sweeper," looked at the floor as claimed. For the foregoing reasons, we find there were genuine issues of material fact, and we reverse and remand for further proceedings.

¶ 58        Reversed and remanded.

---

[10] In addition, the incident report had a "no" next to the entry for the sweep log.