2025 IL App (1st) 231381

FIRST DISTRICT
SECOND DIVISION
March 18, 2025

No. 1-23-1381

| | | |
|---|---|---|
| JENICE HAMPTON, CLAIRE BATHERSON, MARK BATHERSON, THERESA BECTON, KIMBERLY DAVIDSON, CLAUDIA DUNCAN, JU WANNA L. ELERY, NANCY ELERY, VALENCIA GOODLOW, VENETTA JOHNSON, FRANK KOOB, MARLA McELROY, CARRIE NAVARRO, JANICE O'CONNOR, LAVERN PARTEE, DAVID ROSELUND, CASSANDRA SANDERS, KIMBERLY SUTTLE, MARTHA TURNER, MICHAEL TURNER, GERALDINE WARD, JOSEPH WARD, ROY WHITE SR., KITTY WILLIAMS, ISABELLE WRIGHT, LENETTE YARBAR, EARNESTINE PULLEN, SHYREE PULLEN, JOYCE WILETTE BROWN, SHARON HOOKER, and ROBERT WILSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. No. 11CH25822 (Consolidated with 11CH25985) |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| THE METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | ) ) ) | Honorable Neil H. Cohen, |
| Defendant-Appellee, | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiffs,[1] a group of landowners and residents in Cook County, sought relief from

defendant the Metropolitan Water Reclamation District of Greater Chicago (District), based on

allegations of flooding to their properties following a July 2010 rainstorm. Plaintiffs sought

---

[1]Plaintiffs initially filed on behalf of a proposed class but withdrew their intent to seek a class certification in the trial court.

damages under section 19 of the Metropolitan Water Reclamation District Act (Act) (70 ILCS 2605/19 (West 2022)), the takings clauses of the Illinois Constitution (Ill. Const. 1970, art. I, § 15) and the United States Constitution (U.S. Const., amend. V.), and constitutional damage under the Illinois takings clause. Plaintiffs' claims under section 19 of the Act were dismissed with prejudice in March 2013. In 2023, the District moved for summary judgment on all counts under the takings clauses. Following briefing by the parties, the trial court granted the District's motion and found that plaintiffs failed as a matter of law to establish a taking under both the Illinois and United States Constitutions or constitutional damage under the Illinois takings clause.

¶ 2       Plaintiffs argue on appeal that the trial court erred in (1) dismissing their section 19 claim with prejudice, (2) finding as a matter of law that no violation of the takings clause occurred under both the Illinois and United States Constitutions, and (3) finding that plaintiffs were not entitled damages under the damage prong of the Illinois Constitution's takings clause.

¶ 3       We begin by noting that plaintiffs' brief fails to adhere to Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), which requires the statement of facts in appellate briefs "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Here, the statement of facts section consists of a mere two pages and fails to provide a complete recitation of the proceedings in the trial court, including a factual summary of the experts' reports or deposition testimony, as well as plaintiffs' deposition testimony about the flooding to their properties.

¶ 4       The circumstances for this action arose following severe storms over the Chicago region during July 23 and 24, 2010. Plaintiffs were all residents of Bellwood, Hillside, and Westchester

during those July 2010 storms and experienced flooding in their homes as a result. Plaintiffs filed actions against the District in July 2011, alleged that the District's actions within its infrastructure caused their flooding, and sought damages.

¶ 5    Initially, two groups of plaintiffs filed separate cases against the District seeking damages under section 19 of the Act and the takings clause of the Illinois Constitution. The Act was passed in 1889 to "create sanitary districts and to remove obstructions in the Des Plaines and Illinois Rivers" (1889 Ill. Laws 126), including the authorization to allow the District to reverse the flow of the Chicago River. *Town of Cicero v. Metropolitan Water Reclamation District of Greater Chicago*, 2012 IL App (1st) 112164, ¶¶ 3-4 & n.2  (basing its recitation of facts on our supreme court's review of the history of the Act in *Canal Commissioners v. Sanitary District of Chicago*, 191 Ill. 326 (1901), *City of Chicago v. Green*, 238 Ill. 258 (1909), and *Gentleman v. Sanitary District of Chicago*, 260 Ill. 317 (1913)). Section 19 was "passed to ease concerns about these sewage and flooding problems and to compensate downstream landowners for damages to their property resulting from construction of the main channel and reversal of the Chicago River." *Cicero*, 2012 IL App (1st) 112164, ¶ 27.

¶ 6    The District filed motions to dismiss both complaints pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2010)) and argued that neither section 19 of the Act nor the Illinois Constitution's takings clause afforded plaintiffs relief for their alleged injuries. Specifically, the District contended that section 19 does not apply to this case because it did not involve damage caused by the reversal of the Chicago River and its related channels and that plaintiffs' claim for an unconstitutional taking is insufficient at law because the temporary flooding alleged in the complaint did not amount to a constitutional taking. Each of the trial judges assigned to the two cases granted the District's motion in part and

denied it in part by dismissing plaintiffs' section 19 claims with prejudice, but each allowed the takings claims to stand. The two cases were consolidated in March 2013.

¶ 7    The trial court subsequently granted in part the District's motion seeking a permissive interlocutory order certifying a question for appeal pursuant to Illinois Supreme Court Rule 308(a) (eff. Feb. 26, 2010) and certified the following question for appeal: "Does *Arkansas Game* [*& Fish Comm'n v. United States*, 568 U.S. 23] (2012) overrule the Illinois Supreme Court's holding in *People ex rel. Pratt v. Rosenfield*, 399 Ill. 247 (1948), that temporary flooding is not a taking?" This question was subsequently reviewed by the Illinois Supreme Court in *Hampton v. Metropolitan Water Reclamation District of Greater Chicago*, 2016 IL 119861. The supreme court answered the question in the negative and found these cases were consistent with each other. The *Hampton* court further observed that neither *Arkansas Game* nor *Pratt* set forth a bright-line rule regarding whether temporary flooding constitutes a taking and that courts must consider the facts of each case to determine whether the property owner's use and enjoyment of the property has been diminished or destroyed. *Id.* ¶ 22. In considering plaintiffs' taking claim, the supreme court held that the facts alleged in plaintiffs' amended complaint were not sufficient to allege a taking under the Illinois takings clause because plaintiffs did not allege that the flooding "radically interfered" with their use and enjoyment of their properties. *Id.* ¶ 32. The supreme court remanded the case for further proceedings. *Id.* ¶ 33.

¶ 8    On remand, plaintiffs filed a second amended complaint against the District: (1) the dismissed claim of damages under section 19, realleged "solely" to preserve the record and plaintiffs' appellate issues; (2) a violation of the takings clause under the Illinois Constitution; (3) a constitutional claim for damages pursuant to the takings clause of the Illinois Constitution; and (4) a violation of the takings clause under the fifth amendment of the United States

Constitution.

¶ 9     Plaintiffs asserted the following allegations regarding the District's water management in the area. The District maintained, managed, regulated, and controlled several watersheds and waterways upstream and downstream of the Des Plaines River, Salt Creek, and Addison Creek and its tributaries. The District also maintained, managed, regulated, and controlled various reservoirs, ponds, and underground water storage as part of the District's stormwater and flood control system. These reservoirs and ponds included O'Hare South Detention Basin, O'Hare North Retention Pond, Lake O'Hare, Redmond Reservoir, Mayfair Reservoir, and the Touhy Avenue flood control reservoir cells 1 and 2. The District further maintained, managed, regulated, and controlled a series of locks and other water control devices along the Chicago area waterway system, including the Lockport Lock and Dam and the Chicago River control works. The District also constructed, maintained, regulated, and controlled the Westchester Pump Station in Westchester, Illinois. The Westchester Pump Station outflows onto Addison Creek at or near the junction into Salt Creek.

¶ 10     Plaintiffs alleged that, during the July 2010 storms, the District (1) closed the Lockport Lock and Dam floodgate to the Des Plaines River; (2) closed the locks to Lake Michigan at the Chicago River Control Works; (3) discharged excess storm water runoff from the O'Hare South Detention Basin, the O'Hare North Retention Pond, and the Touhy Avenue flood control reservoir cells 1 and 2; (4) pumped storm water into Addison Creek and the Salt Water Creek upstream from plaintiffs' properties; and (5) pumped storm water from the Mayfair Reservoir into Lower Salt Creek. Plaintiffs further alleged that the District intended to take all these actions for the purpose of avoiding wastewater, stormwater, and flood water damage to Lake Michigan and to public structures and properties including O'Hare airport, the Interstate 290 roadway, and

the Interstate 294 roadway. These actions by the District caused an increase in flow and volume of waterways upstream and downstream from the villages of Hillside, Bellwood, and Westchester.

¶ 11    Plaintiffs further alleged that the District knew and/or should have known that such discharges would cause widespread flooding to the communities of Hillside, Bellwood, and Westchester, including the residential properties of plaintiffs. It was foreseeable that the District's actions during a heavy rain event would send the diverted waters onto plaintiffs' properties and cause "permanent and irreparable damage."

¶ 12    Plaintiffs also alleged that they suffered flooding of similar duration and magnitude, as a result of the District's intentional actions similar and/or identical to those alleged, causing permanent and irreparable damage to plaintiffs' properties on (1) September 13-16, 2007, (2) September 12-15, 2008, and (3) April 18, 2013. The widespread and damaging flooding caused by the District's intentional actions in 2007, 2008, 2010, and 2013 resulted in the "superinduced floodwaters" remaining on and/or in plaintiffs' properties for "multiple hours, and in some cases, multiple days." Plaintiffs maintained that, without these increased flows of waters directed by the District, flooding in the communities of Hillside, Bellwood, and Westchester "would not have occurred and/or would have been far less severe."

¶ 13    As a result of the District's actions, plaintiffs claimed to have suffered "permanent and irreparable damage to their homes," including that some have abandoned their property and others were "unable to repair or live in entire floors of their homes as a result of the radical damage, mold or rot caused by this severe flooding." Plaintiffs also alleged having their homes, personal belongings, basements, and other private property damaged or destroyed by the flooding. Further, under their constitutional claim for damage under the Illinois takings clause,

6

plaintiffs alleged that they incurred expenses for water pumps; vacuum trucks; and replacement of furnaces, water heaters, washer and dryer machines, sump pumps, furniture, appliances, electronics, wiring, floors, walls, windows, and personal effects, as well as replacing or repairing landscaping, driveways, patios, and decks, along with the loss of vehicles.

¶ 14    During discovery, the trial court dismissed nine plaintiffs for failing to respond to discovery. The remaining plaintiffs were deposed. In their depositions, none of the plaintiffs testified that they experienced flooding on all four dates alleged in the complaint. Many plaintiffs were unsure when a flood had occurred or described other instances as "seepage," as well as a "puddle." Several of the plaintiffs only experienced flooding during the July 2010 storms. Six plaintiffs testified to having flood issues prior to 2010. Two of those plaintiffs recalled that the floods had occurred in the 1980s. Five plaintiffs observed flood water after the 2010 event. Only two plaintiffs, a married couple, testified to having flood issues in 2008, 2010, and 2013. When they bought their house, they were informed it was in a floodplain and purchased flood insurance.

¶ 15    The parties also submitted reports and depositions from expert witnesses. Plaintiffs relied on the expert testimony of Dr. Philip Bedient. He was asked to evaluate the flooding issues related to the July 2010 as associated with plaintiffs and to opine whether or not the District contributed to plaintiffs' flooding. In his report, Dr. Bedient observed that the July 2010 storm brought about six to seven inches of rain over the Addison Creek watershed and this "amount of rain over about a 12-hour period approximated a 100-year frequency rainfall," but the flood levels along Addison Creek reached the highest level ever recorded at the United States Geological Survey (USGS) gauge on the creek and were close to the 500-year frequency. Most of the plaintiffs' homes were located within or adjacent to the floodplains for Addison Creek,

7

which is a tributary of Salt Creek, which is then a tributary to the Des Plaines River. Most of plaintiffs' homes were located within the service area of the Westchester Pump Station, which involved the sewer systems of these villages. When Addison Creek flooded over its banks, plaintiffs' homes in its vicinity "would be expected to experience basement flooding caused or contributed by this increased flooding along Addison Creek."

¶ 16    Some plaintiffs' homes were located in the Salt Creek watershed in the vicinity of the Mayfair Reservoir, a flood control reservoir built by the District. The villages of Bellwood, Hillside, and Westchester "often" have separate sanitary sewers and storm sewers. Three storm sewer systems converge at the Westchester Pump Station. The Westchester Pump Station has four available pumps, and during the July 2010 storm, it activated two of the four pumps.

¶ 17    During this flood event, the Westchester Pump Station pumped "combined stormwater and sanitary sewer water into Addison Creek at a rate and a velocity that causes a restriction to the free flow of flood waters coming down this creek, creating a backwater condition upstream along this creek and raising flood levels accordingly." Dr. Bedient further observed that the Mayfair Reservoir was designed to accommodate a 100-year storm, but the July 2010 storm created storm levels along Salt Creek below the 100-year levels and the reservoir still overflowed. He found that the Mayfair Reservoir's lack of storage capacity made it unable to handle the 100-year storm and the reservoir's design was agreed to by the District. This design "caused or contributed to" the flooding of plaintiffs' properties upstream and downstream of the reservoir. He opined, within a reasonable degree of engineering certainty, that the District's various mechanisms, including pump operations, creek overflowing, infiltration of sewers, and reservoirs overflowing, were "a cause of or contributed to the flooding experienced" by plaintiffs.

8

¶ 18     During his deposition, Dr. Bedient agreed that all streams and rivers naturally flood. Rainfall intensity is "one of the primary drivers of flooding," and more intense rainfall generally leads to more flooding. He admitted that he did not conduct an analysis of what would have happened to Addison Creek if the Westchester Pump Station were not operating during the July 2010 storm. He also did not analyze the effect of removing the Westchester Pump Station discharge on the sanitary sewers of Bellwood, Hillside, and Westchester. He could not provide a calculation in inches or feet as to how much the Westchester Pump Station elevated the water level in Addison Creek during the July 2010 storm. Dr. Bedient had no opinion regarding whether Addison Creek would have remained within its banks during the July 2010 storm if not for the District's operation of the Westchester Pump Station. He did not know what amount of flooding experienced by a particular plaintiff was caused by the operation of the Westchester Pump Station.

¶ 19     Regarding the Mayfair Reservoir, Dr. Bedient had no opinion as to what amount of storage would have been necessary at the reservoir to protect a plaintiff's home completely from flooding during the July 2010 storm. He did not conduct an analysis to determine what would have happened to plaintiffs' homes if the reservoir were not present at all.

¶ 20     The District presented the report and deposition testimony of Dr. Marcelo Garcia as its expert witness. In his report, Dr. Garcia disagreed with Dr. Bedient's contention that the rainfall totals were approximately six to seven inches. Dr. Garcia opined that those totals were generally true for the greater Chicago area but that they "substantially" understated the rainfall depths over specific municipalities of concern, which included Bellwood, Hillside, and Westchester. He stated that the Cook County Precipitation Network's precipitation gauges "put rainfall totals greater than 8-inches over a 12-hour period," with some areas receiving greater than 9 inches.

Dr. Garcia used a model in his analysis to measure any difference in water flow if the Westchester Pump Station had activated all four pumps. His analysis showed that an increase in flow by all four pumps in operation would have increased water levels in Addison Creek by less than one inch. He found that the activation of the Westchester Pump Station "had a negligible impact on water levels in Addison Creek while reducing the risk of basement flooding by decreasing water levels at the pumping station and therefore also upstream of the pumping station in the local sewers."

¶ 21    Dr. Garcia further observed that the mean Next Generation Weather Radar (NEXRAD) estimated the 12-hour rainfall over the drainage basin was 7.9 inches, "well in excess of the likely design capacity of the sewers." He explained that "modern standards call for storm sewers to be designed for a 10- to 25-year return period event, which was substantially exceeded by the July 2010 storm event." In other words, the storm sewers were designed to handle storm events that recurred within 10 to 25 years.

¶ 22    Dr. Garcia also used a model to estimate the flows within the Mayfair Reservoir watershed to determine its beneficial impact by conducting two scenarios, one with the reservoir as it existed in 2010 and one assuming that the reservoir had not been built. The models indicated that the Mayfair Reservoir acted to "reduce flood depths by between 0.2 and 0.6 feet when compared with simulated conditions had the reservoir not be [*sic*] present." He opined that the failure to activate the Westchester Pump Station would result in increased water levels upstream of the pumping station by 1 to 1½ feet, which increased the risk of sanitary sewer backups.

¶ 23    Dr. Garcia found that "this rainfall event overwhelmed local storm sewer capacities and added significant flow to Addison Creek resulting in significant surface flooding." He found that the July 2010 storm had estimated precipitation depths ranging from 6 to 9.25 inches of rain

within a 12-hour period, which corresponds with an estimated return period of 100 to greater than 900 years.

¶ 24    In his opinion with a reasonable degree of engineering certainty, Dr. Garcia concluded that "exceptional" rainfall amounts fell during the July 2010 storm that "overwhelmed local storm sewer systems contributing to localized street flooding and resulting in flood stages within Addison Creek." Further, this storm event also filled the Mayfair Reservoir and overwhelmed the storm sewer resulting in overland flooding downstream of the reservoir. This extreme rainfall was localized largely over the municipalities of concern. He found that no actions taken by the District "exacerbated surface flooding within the municipalities of Bellwood, Westchester, or Hillside and the operation of the Westchester Pumping Station acted to minimize the sanitary sewer backups by lowering water levels within the receiving [District] owned interceptors and subsequently providing local sanitary sewers more opportunity to drain." Similarly, the Mayfair Reservoir acted to substantially reduce the peak flow.

¶ 25    After discovery, the District filed a motion for summary judgment on the claims alleged in plaintiffs' second amended complaint and argued that facts and expert testimony showed that the flooding experienced by plaintiffs was not recurring or of significant duration, the alleged damage was not severe enough to rise to a taking, and evidence of causation by the District was lacking. The District also asserted that because four plaintiffs, Carrie Navarro, Shyree Pullen, Michael Turner, and Ju Wanna Elery, did not own the damaged property and were renting, they could not maintain a takings claim. Plaintiffs conceded this issue before the trial court, and summary judgment was granted on the takings claims under the Illinois and United States Constitutions for those plaintiffs.

¶ 26    Following the full briefing by the parties, the trial court entered a written order granting

the District's summary judgment motion. The court first considered plaintiffs' claims under the

takings clauses of the Illinois Constitution and the United States Constitution. The court

reviewed plaintiffs' deposition testimony and found that the evidence established that plaintiffs

"experienced either a single temporary flooding event in July of 2010 or experienced the July

2010 event and a few instances of temporary, sporadic flooding and seepage." The court

concluded that this evidence was "insufficient" as a matter of law to rise to the level of "frequent

and inevitably recurring inundation necessary to establish a taking." The court also found that the

evidence showed that, while plaintiffs' homes were damaged, none were destroyed and the

damage was repaired.

¶ 27    The court further found that plaintiffs could not establish the necessary causation, *i.e.*, the

flooding would not have occurred without the District's action. The court reviewed the expert

testimony presented by both sides and found that Dr. Bedient's opinion was "primarily" about

the District's alleged failure to act. The court concluded that "at most" plaintiffs' expert

testimony established that the District's "affirmative actions were a contributing factor to the

flooding" and was insufficient to establish a taking.

¶ 28    Finally, the court addressed plaintiffs' constitutional claim for damages pursuant to the

takings clause of the Illinois Constitution. The court held that, in order to be entitled to a remedy

for damage to real property, a plaintiff must still establish a taking. Because the evidence

demonstrated that plaintiffs could not establish a taking, the District was entitled to summary

judgment on this claim.

¶ 29    This appeal followed.

¶ 30    Before we reach plaintiffs' arguments on appeal, we consider the District's motion to

dismiss the appeal in part, which was taken with the case. The District raised two issues for

12

dismissal. First, the District contends that plaintiffs' notice of appeal listed three individuals, Joyce Wilette Brown, Sharon Hooker, and Robert Wilson, who had not previously been named as parties in the case and therefore cannot be parties here. Plaintiffs concede this contention. As these individuals were never named as parties in the trial court, they are hereby dismissed from the appeal. See *MidFirst Bank v. McNeal*, 2016 IL App (1st) 150465, ¶ 19 ("a nonparty does not have standing to appeal from a judgment in the trial court"); see also *Stone v. Baldwin*, 414 Ill. 257, 262 (1953) ("an appeal by a person not a party to the record is unauthorized and void").

¶ 31　　Next, the District argues that this court lacks jurisdiction to consider plaintiffs' section 19 claims under the Act (70 ILCS 2605/19 (West 2022)) because plaintiffs failed to list the trial court's orders dismissing these claims in the notice of appeal.

¶ 32　　Illinois Supreme Court Rule 303(b)(2) (eff. June 4, 2008), provides that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Without a properly filed notice of appeal, the appellate court lacks jurisdiction over the matter and is obliged to dismiss the appeal. *Corah v. Bruss Co.*, 2017 IL App (1st) 161030, ¶ 20. The reviewing court obtains jurisdiction to consider only the judgments or parts of judgments specified in the notice of appeal. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011). It is undisputed that the dates of the orders dismissing those claims were not listed on plaintiffs' notice of appeal. The notice of appeal lists only the July 6, 2023, date when the trial court granted the District's motion for summary judgment. The requested relief in the notice of appeal consists of checked boxes asking this court to "reverse the trial court's judgment and send the case back to the trial court for any hearings that are still required" and "vacate the trial court's judgment and send the case back to the trial court for a new hearing and a new judgment." There are no specific details listed for the relief sought.

¶ 33    Plaintiffs respond in their opening brief that the dismissal orders were not appealable under Rule 301 until the trial court granted summary judgment in favor of the District on the remaining claims. They assert that this was the first and only opportunity to challenge the previous dismissals. While this is correct, this argument lacks merit and misses the jurisdictional question entirely. It is irrelevant that this was their first opportunity to appeal these dismissal orders; the question is whether the issues can be considered by this court since they were not listed in the notice of appeal.

¶ 34    Plaintiffs also argue that this court has jurisdiction on these claims because the notice of appeal fairly and accurately set out the judgment appealed. They acknowledge that the appellate court lacks jurisdiction to review other judgments not specified or not fairly inferred from the notice as intended to be presented for review. See *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.*, 78 Ill. 2d 56, 61 (1979) (supreme court had no jurisdiction to review order dismissing counterclaim when notice of appeal only sought review of order granting summary judgment). But plaintiffs argue that an exception applies because the summary judgment order specified in the notice of appeal incorporated the prior order.

¶ 35    While notice is jurisdictional, our supreme court has held that we must construe a notice liberally. *Filliung v. Adams*, 387 Ill. App. 3d 40, 49 (2008) (citing *People v. Smith*, 228 Ill. 2d 95, 104 (2008)). The supreme court has held that notices of appeal "confer jurisdiction even if the order was not expressly mentioned in the notice of appeal, if that order was 'a "step in the procedural progression leading" ' to the judgment which was specified in the notice of appeal." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 23 (quoting *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979)). "It is not necessary that the notice of appeal identify a particular order to confer jurisdiction, as long as the order that is identified in the notice of appeal directly

14

relates back to the order or judgment sought to be reviewed." *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 8.

¶ 36    Plaintiffs assert that this exception applies but fail to argue how the dismissal of the section 19 claims related to the summary judgment order on the remaining claims, such that it could be a step in the procedural progression. Instead, they point to a brief observation in the summary judgment order noting that the section 19 count was "previously dismissed with prejudice and is re-pled solely for preserving appeal." Plaintiffs contend that their intent to appeal the dismissals was therefore contained in the order. This passing mention was in the background of the order as part of the trial court's detailing of the counts in the second amended complaint. Plaintiffs further argue that their intent to appeal the section 19 claims was shown in their second amended complaint because the claim was repled with the note that claim had been dismissed and was set forth solely to preserve the claim for appeal. Plaintiffs do not cite any authority for their assertion that this note in an amended complaint was sufficient to signal their intent to raise the claims on appeal when the dismissal orders were not listed in the notice of appeal.

¶ 37    The District maintains that this court lacks jurisdiction to consider the section 19 claims because they do not fall within the *Burtell* exception. Specifically, it argues that the orders dismissing those claims were not part of the procedural progression of the case.

¶ 38    Recently, this court found that it lacked jurisdiction over claims not listed in the notice of appeal. *Schittino v. Village of Niles*, 2024 IL App (1st) 230926, ¶ 23. There, the intervenors listed only a summary judgment order in their notice of appeal but sought to review a previous order denying their motion to dismiss the complaint as *res judicata*. The court concluded that it lacked jurisdiction to review the order denying the motion to dismiss. *Id.* ¶ 25 (citing *Sankey Brothers*,

78 Ill. 2d at 61, *Corah*, 2017 IL App (1st) 161030, ¶¶ 20-21 (notice of appeal identifying order granting summary judgment did not give appellate jurisdiction over earlier order dismissing parts of complaint), *Village of Lisle v. Village of Woodridge*, 192 Ill. App. 3d 568, 572 (1989) (same), and *Long v. Soderquist*, 126 Ill. App. 3d 1059, 1062 (1984) (same)); see also *Alpha Gamma Rho Alumni v. People ex rel. Boylan*, 322 Ill. App. 3d 310, 313-14 (2001) (finding that the plaintiffs' notice of appeal failed to "fairly and accurately advise" the defendants that plaintiffs sought relief in this court against all 73 defendants with alleged improper taxing district surpluses).

¶ 39    Similarly, in *Corah*, the plaintiff filed a complaint alleging that his termination was in violation of the Whistleblower Act (740 ILCS 174/20 (West 2012)). *Corah*, 2017 IL App (1st) 161030, ¶ 3. Following discovery, the defendant moved for summary judgment and argued that the plaintiff had failed to show that he refused to participate in any activity that would have resulted in a violation of any state or federal law, rule, or regulation, as required for a claim under the Whistleblower Act. *Id.* ¶ 11. The trial court granted the defendant's motion as to the plaintiff's claims for emotional distress and punitive damages but granted the plaintiff leave to file an amended complaint to comport with the proofs in September 2014. Later, the defendant moved to strike the plaintiff's amended complaint, which the trial court denied but directed the plaintiff to replead his claims without referring to Occupational Safety and Health Administration (OSHA) violations. The plaintiff complied and filed a claim for common-law retaliatory discharge. *Id.*

¶ 40    In April 2016, following briefing, the trial court granted summary judgment in favor of the defendant on the plaintiff's whistleblower claim but allowed the retaliatory discharge claim to proceed. *Id.* ¶ 12. The plaintiff voluntarily dismissed his complaint and filed a notice of appeal listing only the April 2016 order. *Id.*

¶ 41 The plaintiff argued, in part, on appeal that the trial court erred in dismissing his emotional distress claims in the September 2014 summary judgment order, as well as ordering him to strike his references to OSHA violations in a December 2014 order. *Id.* ¶ 20. The reviewing court observed that the plaintiff failed to include these orders in his notice of appeal and concluded that it lacked jurisdiction to review the order dismissing the emotional distress and punitive damages claims. *Id.* ¶ 21. However, the court found the OSHA claim was "arguably inferred" in the notice of appeal and considered that claim on its merits. *Id.*

¶ 42 The supreme court reached a similar result in *Pappas*, 242 Ill. 2d at 176-77. That case involved multiple tax valuation cases with multiple operative orders. The supreme court found that it lacked jurisdiction over the collector's claims regarding the trial court's award of judgment interest because it did not include that order in its notice of appeal. *Id.* at 177. The court held that the order at issue "constituted an entirely different matter" from those orders specified in the notice of appeal. *Id.* The court further ruled that the collector could not remedy her error by raising the issue in either her docketing statement or her appellate brief. *Id.* at 177-78.

¶ 43 Here, the notice of appeal did not list or refer to the previous orders dismissing the section 19 claims. We find that this case does not fall within the *Burtell* exception because the dismissal of those independent counts did not fall within the "procedural progression" leading to the summary judgment on the remaining counts. This case is more akin to *Schittino*, *Corah*, and *Sankey* because the section 19 counts were an independent basis for relief from the counts under the takings clauses of the United States Constitution and Illinois Constitution. We also reject plaintiffs' claims that the appeal of those orders can be inferred simply because the brief noted that it was repled to preserve it for an appeal or that the trial court made a passing reference to the claims in the summary judgment order. Plaintiffs' notice of appeal stated, "List the date of

every order or judgment you want to appeal," and plaintiffs only listed the July 6, 2023, summary judgment order. As noted above, the requested relief did not include any detailed explanation of the relief requested. Even liberally construed, nothing in this notice of appeal would imply that plaintiffs sought to appeal the earlier section 19 dismissal orders. Accordingly, we grant the District's motion to dismiss plaintiffs' section 19 claims.

¶ 44    Turning to the merits, plaintiffs first argue that the trial court erred in dismissing their claims of a violation of the takings clauses of the Illinois and United States Constitutions. Specifically, they contend that a genuine issue of material fact exists as to whether a taking occurred.

¶ 45    Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). A genuine issue of material fact exists when the evidence is sufficient to cause a reasonable jury to return a verdict for the party opposing the entry of summary judgment. *Schuster v. Occidental Fire & Casualty Co. of North America*, 2015 IL App (1st) 140718, ¶ 16. While a plaintiff is not required to prove his case at the summary judgment stage, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). To determine whether a genuine issue as to any material fact exists, we review the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Summary judgment in favor of the defendant is proper if the plaintiff fails to establish any element of the cause of action. *Id.*

¶ 46     We review the trial court's summary judgment ruling *de novo*. *Id*.  Under a *de novo* standard of review, we use the same analysis that a trial court would with no deference to the trial court's decision. *Ruda v. Jewel Food Stores, Inc.*, 2024 IL App (1st) 230582, ¶ 37. Because we review the trial court's judgment, rather than its reasoning, we may affirm on any basis supported by the record. *Philadelphia Indemnity Insurance Co. v. Pace Suburban Bus Service*, 2016 IL App (1st) 151659, ¶ 21.

¶ 47     The Illinois takings clause states: "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I, § 15. Similarly, the federal takings clause provides, in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const., amend. V. The takings clauses of the Illinois Constitution and the United States Constitution are analyzed in the same manner, and federal law is relevant to whether a taking has occurred under the Illinois Constitution. *Hampton*, 2016 IL 119861, ¶¶ 10-16. Under the takings clause, when the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the property owner. *Arkansas Game*, 568 U.S. at 31.

¶ 48     This case presents a claim for inverse condemnation, which arises when a property owner seeks compensation for a taking of private property but no condemnation proceeding has been initiated. *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 77 (2010); see *St. Bernard Parish Government v. United States*, 887 F.3d 1354, 1359 (Fed. Cir. 2018)). The property owner challenging a governmental action as an unconstitutional taking bears a substantial burden. *Eastern Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) (opinion of O'Connor, J., joined by Rehnquist, C.J., and Scalia and Thomas, JJ.).

¶ 49     The Illinois Supreme Court has defined a taking as a physical invasion of private property or the radical interference with a private property owner's use and enjoyment of the property. *Hampton*, 2016 119861, ¶ 24. In *Hampton*, our supreme court found that temporary flooding may constitute a taking "when the flooding directly and immediately interferes with the owner's enjoyment and use of the land." *Id.* ¶ 21 (citing *Arkansas Game*, 568 U.S. at 33-34). "[A] taking occurs when real estate is physically invaded " 'by superinduced additions of water *** so as to effectually destroy or impair its usefulness.' " *Id.* ¶ 24 (quoting *Horn v. City of Chicago*, 403 Ill. 549, 554 (1949)). When flooding does not cause this level of destruction, then it is not a taking. *Id.*

¶ 50     The *Hampton* court dictated that there are additional facts to consider in determining whether a temporary flooding constituted a taking, including the time and duration of the flooding, whether the invasion of the property was an intentional act or a foreseeable result of an authorized government action, and the character of the land and the owner's reasonable investment-backed expectations regarding the use of the land. *Hampton*, 2016 IL 119861, ¶ 25 (citing *Arkansas Game*, 568 U.S. at 39). Where a claim of taking of private property for a public use is founded upon interference with land due to flooding, the burden of proof consists of more than a mere showing that a governmental action has interfered with property rights. *Accardi v. United States*, 599 F.2d 423, 429 (Ct. Cl. 1979).

¶ 51     Because we find it dispositive of plaintiffs' claim, we begin our analysis with the question of causation. Proof of a claim for temporary flooding requires the plaintiffs to establish that government action caused the injury to their properties, including that the invasion was the " 'direct, natural, or probable result of an authorized activity.' " *St. Bernard Parish*, 887 F.3d at 1359-60 (quoting *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). The

burden of proof is on plaintiffs to show that the District's action caused their injuries. *Id.* at 1362. To establish liability for a temporary taking, plaintiffs must present proof that the invasion was either intentional or foreseeable. *Id.* at 1360 (citing *Arkansas Game*, 568 U.S. at 39). The use of the disjunctive "or" in the *Arkansas Game & Fish* factors makes clear that one of these circumstances must be present to support the finding of a taking. *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 254 (2019). For a taking to have occurred, the government cannot be liable for its failure to act but only for its affirmative acts. *St. Bernard Parish*, 887 F.3d at 1360.

¶ 52     Causation requires plaintiffs to show what would have occurred if the government had not acted. *Id.* at 1362. "In order to establish causation, a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *Id.*; see *Board of Supervisors of Issaquena County v. United States*, 84 F.4th 1359, 1368 (Fed. Cir. 2023) (reaffirming the causation principles set forth in *St. Bernard Parish* that there can be no takings liability absent a showing of "the value of its property but for the government's actions"). In a causation analysis, courts must consider the impact of the entirety of government actions that address the relevant risk. *Board of Supervisors of Issaquena County*, 84 F.4th at 1364. If the most that can be said is that the government's actions were a contributing factor of the flooding, rather than the flooding being the natural or probable consequence of those actions, then it cannot support an action for taking. *In re Upstream Addicks*, 146 Fed. Cl. at 254-55. "In the flooding context, this means plaintiffs must show that their land is *more* burdened by flooding than it would have been prior to construction." (Emphasis in original.) *Del Mar v. United States*, 173 Fed. Cl. 159, 166 (2024) (citing *Board of Supervisors of Issaquena County*, 84 F.4th at 1366).

¶ 53    We find the causation analyses in *St. Bernard Parish* and *Accardi* to be relevant to our discussion. In *St. Bernard Parish*, the parish government and other property owners from New Orleans's ninth ward filed a takings claim in the United States Court of Claims alleging that the federal government was liable for the flood damage from Hurricane Katrina and other hurricanes. *St. Bernard Parish*, 887 F.3d at 1357.

¶ 54    The Mississippi River-Gulf Outlet (MRGO) was constructed by the Army Corps of Engineers to increase commerce between the port of New Orleans and Mexico. *Id*. at 1357. The plaintiffs alleged that, over the course of the several decades, the construction, operation, and improper maintenance of the MRGO channel by the United States government caused various adverse impacts that increased storm surge along the channel, including "increased salinity in the water by providing a direct route for salt water to flow into the area from the Gulf of Mexico," and creating a "potential for a funnel effect," which intensified flooding. *Id.* at 1357-58. The plaintiffs argued that the "construction and operation of MRGO and failure to properly maintain or modify it constituted a taking by causing flooding damage to their properties." *Id*. at 1358. Following a bench trial, the Court of Claims ruled that a temporary taking had occurred, found "a causal link existed between increased storm surge and MRGO," held that these environmental effects were foreseeable by at least 2004, and granted a judgment in favor of the plaintiffs. *Id.* at 1358-59.

¶ 55    Upon review, the Court of Appeals observed that proof of a temporary taking required the plaintiffs to establish that "government action caused the injury to their properties—that the invasion was the 'direct, natural, or probable result of an authorized activity.' " *Id.* at 1359-60 (quoting *Ridge Line, Inc.*, 346 F.3d at 1355). The appellate court pointed out that "the plaintiffs presented no evidence, and the Claims Court made no findings," regarding whether the

combination of these MRGO-related effects and the levees "caused flooding on plaintiffs' properties greater than would have occurred had the government engaged in no action at all." *Id.* at 1359. The reviewing court also noted that the Court of Claims' liability finding was premised largely on the government's failure to take action, particularly on its failure to maintain MRGO or to modify it. *Id.* at 1360.

¶ 56     The Court of Appeals further observed that plaintiffs "made no effort to show" that the combination of MRGO and the Lake Pontchartrain and vicinity levees caused more flooding than would have occurred without any government action, but rather the plaintiffs asked the court to limit its consideration to only the MRGO. *Id.* Disagreeing with the Court of Claims' finding, the reviewing court found that, "[w]hile the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim." *Id.* "On a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government." *Id.* The plaintiffs "point to no case where the government incurred takings liability based on inaction." *Id.* at 1362. A takings liability "must be premised on affirmative government acts" and the government's failure "to properly maintain the MRGO channel or to modify the channel cannot be the basis of takings liability." *Id.*

¶ 57     In considering causation, the Court of Appeals found that the plaintiffs failed " to present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all." *Id.* at 1363. The plaintiffs based their causation argument on the construction and operation of the MRGO channel but did not consider the impact of the levee system. This resulted in the plaintiffs' failure to "take account of other government actions *** that mitigated the impact of MRGO and may well have placed the plaintiffs in a better position than if the government had taken no action at all." *Id.* The

reviewing court pointed out that the plaintiffs' approach to causation was "simply inconsistent with governing Supreme Court and Federal Circuit authority, particularly in flooding cases," and that authority determined that "the causation analysis must consider the impact of the entirety of government actions that address the relevant risk." *Id.* at 1364. The court further rejected the plaintiffs' argument that the beneficial government project must be part of the same project. "When the government takes actions that are directly related to preventing the same type of injury on the same property where the damage occurred, such action must be taken into account even if the two actions were not the result of the same project." *Id.* at 1366. Accordingly, the Court of Appeals concluded that the plaintiffs "failed to establish that government action, including both the construction of MRGO and the levees, caused their injury." *Id.* at 1367.

¶ 58    In *Accardi*, the plaintiffs were property owners along the Trinity River in northern California, and they alleged that a taking occurred under the United States Constitution following a flood in 1974. *Accardi*, 599 F.2d at 424. Their claim was based on the government's operation of the Trinity River division of the Central Valley Project (CVP), which was intended to "increase the supply of water available for irrigation and other beneficial uses in the Central Valley of California." *Id.* at 424-25. While one of the purposes of the CVP was flood control, it was not one of the stated purposes of the Trinity River division, and it had not been operated as a flood control project. *Id.* at 425. The main component of the Trinity River division was the construction of a dam and reservoir lake behind the dam. *Id.* In January 1974, a storm struck the area, and unexpected rainfall in excess of 10 inches fell over a week's time, with 5 inches falling in a 24-hour period. *Id.* at 427. As a result of this rainfall, a flood occurred and damaged the plaintiffs' properties. *Id.* at 427-28.

¶ 59    The plaintiffs asserted that the government's actions resulted in a taking based on past

and future flooding. *Id.* at 428. The government denied a taking occurred and maintained that the plaintiffs had benefited from the operation of the Trinity River division. *Id.* The Court of Claims found that the plaintiffs failed to establish that their properties along the Trinity River have been, or will be at any time in the future, "subjected to frequent and inevitably recurring overflows of water in consequence of the construction and operation of the Trinity River division." *Id.* at 429. The court observed that had the dam not been in operation in January 1974, then the plaintiffs' properties "would have experienced the full force of a peak inflow" of water. *Id.*

¶ 60    The Court of Claims concluded that the "plaintiffs have wholly failed to show that defendant's construction or operation of the Trinity River division subjected their lands to any additional flooding above what would have occurred in consequence of the severe January 1974 storm had defendant not constructed the division at all." *Id.* at 429-30. Further, the court observed that "it is fair to find from this record that the flooding which actually occurred in consequence of that storm was far less than would have been the case had the Trinity River division never been built. In these circumstances, there has been no taking of plaintiffs' property." *Id.* at 430.

¶ 61    We also find the decision in *Sorrells v. City of Macomb*, 2015 IL App (3d) 140763, to be helpful. In that case, the plaintiff homeowners filed suit against a developer who was developing adjacent property in a way that the plaintiffs alleged altered the natural drainage of surface waters and caused an increase of water drainage onto their property. *Id.* ¶ 4. The plaintiffs also included an inverse condemnation claim against the defendant city, which the plaintiffs alleged had approved the construction and design of the developer's plans and to whom the streets and drainage system had been dedicated. *Id.* ¶¶ 17-18. The plaintiffs alleged that the city's actions constituted a taking under the takings clause of the Illinois Constitution. *Id.* ¶ 18. The trial court

25

dismissed the inverse condemnation claim against the city with prejudice. *Id.* ¶ 19.

¶ 62 On appeal, the plaintiffs argued that they sufficiently alleged that "a taking by the City of a drainage easement to drain surface water onto their land, channeled by the City's streets, in unreasonable amounts, and in an unnatural channel." *Id.* ¶ 21. The Third District rejected the plaintiffs' argument and affirmed the trial court's dismissal of the counts against the city. The *Sorrells* court observed that the plaintiffs had alleged that the private development as a whole caused the allegedly unreasonable surface water drainage, not the streets that belonged to the city. *Id.* ¶ 30. The reviewing court found that the plaintiffs' complaint made "clear" that the water allegedly invading the plaintiffs' property was drainage from two storm water detention basins or other drainage basin. *Id.* ¶ 31. At most, the court found, "the allegations, taken as true, indicate that the increased drainage onto the plaintiffs' land was for the benefit of both the private development and the public streets." *Id.*

¶ 63 The *Sorrells* court further found that the plaintiffs had failed "to allege that the water draining from the development onto their land, in an unreasonable amount and unnatural channels, was the intended or foreseeable result, in whole or part, of the City's actions rather than that of the development." *Id.* ¶ 32. The court observed that condemnation cases "traditionally arise from government action alone; not from multiple causes that would include actions of private actors." *Id.* ¶ 33. The court concluded that the city's actions did not cause the alleged flooding of the plaintiffs' land; rather it was caused by the overflow of drainage and detention basins. *Id.*

¶ 64 Turning back to the present case, plaintiffs assert that the flooding they experienced was a direct and foreseeable result of the District's actions. According to plaintiffs, the District "knew" plaintiffs within the downstream path of the Mayfair Reservoir overflow would suffer

26

significant flooding and that the risk of basement flooding was "reduced and/or eliminated" when all four pumps at the Westchester Pump Station were operated. The District responds that plaintiffs failed to demonstrate the necessary cause of plaintiffs' flooding was "but for" the District's operations.

¶ 65    We agree with the District and find that plaintiffs have not presented evidence to establish causation based on the District's actions. Their expert, Dr. Bedient, detailed in his deposition testimony and in his reports that the cause of plaintiffs' flooding during the July 2010 storm was the District's failure to activate more pumps at the Westchester Pump Station and the inadequate capacity of the Mayfair Reservoir. However, noticeably absent from his findings was his opinion regarding what amount of the flooding was attributable to the District. Specifically, he admitted in his deposition that he did not analyze what would have happened if either the Westchester Pump Station or the Mayfair Reservoir were not in operation. He also did not analyze what difference, if any, would have resulted if the Westchester Pump Station had utilized all four pumps, rather than two pumps. Plaintiffs have failed to show what would have occurred if the government had not acted. The reports and testimony from Dr. Bedient are not sufficient to establish the necessary causation and doom plaintiffs' takings claims.

¶ 66    We highlight Dr. Bedient's expert testimony provided in *Upstream Addicks* to contrast the absence of this crucial analysis in this case. In that case, the plaintiffs filed takings claims under the United States Constitution following Tropical Storm Harvey in 2017. During that storm, the Houston area received an average of 33.7 inches of rain over a four-day period. Many properties flooded as a result of the storm. The plaintiffs were private property owners "within the Addicks and Barker Reservoirs, west of Houston, upstream of the federally designed, built, and maintained Addicks and Barker Dams." *Upstream Addicks*, 146 Fed. Cl. at 227. They

"claimed that the United States was liable to them for an uncompensated taking, that is, the government-controlled inundation of their properties by the impounded floodwater from Harvey." *Id.* at 228. During the storm, the United States Army Corps of Engineers operated the Addicks and Barker Dams according to the design criteria, impounding water in the upstream reservoirs. *Id.* at 240-41. The official operating procedures for the dams provided for the dam gates to be operated in a controlled manner to prevent flooding downstream, even when this action would flood upstream private property beyond the government-owned land. *Id.* During Harvey, the flood pools in the reservoirs crested at record pool elevations, causing the flooding of private property. *Id.* at 241.

¶ 67    At trial, Dr. Bedient testified as an expert witness for the plaintiffs about the cause of the flooding at the subject properties. *Id.* at 244. After reviewing multiple data sources, he concluded that the flooding at each subject property was caused by the water impounded behind the Addicks and Barker Dams. *Id.* Dr. Bedient further "addressed whether any of the [subject] properties would have flooded without the dams impounding the rainfall waters or whether any of the properties flooded during Harvey independently of the reservoir pool levels entering onto the properties." *Id.* Specifically, he considered and rejected two other possible causes of the flooding: local drainage systems and riverine flooding. *Id.* "His examination of the relevant local drainage systems' capacities led him to the conclusion that they were capable of adequately handling rainfall much more intense than Harvey." *Id.* at 244-45. He further opined that the riverine flooding that occurred during Harvey "did not cause and would not have caused any" of the subject properties to flood. *Id.* at 245. Dr. Bedient "reached this conclusion by estimating the flood level along each of the creeks in the vicinity of the test properties, and then comparing that elevation to the slab elevation of each *** property." *Id.* He concluded that " 'none of the

28

[subject] properties' structures would have flooded *but for* the impoundment of rainfall runoff waters behind Addicks and Barker Dams.' " (Emphasis added.) *Id.* A judge of the United States Court of Federal Claims found Dr. Bedient's expert testimony was "more persuasive" on the issue of causation compared to the government's expert testimony. *Id.* at 257. The judge observed that Dr. Bedient "reached his conclusions by studying and analyzing real-time data collected during the storm" and his conclusions aligned with what was "actually witnessed." *Id.* at 258. The judge held that the plaintiffs had met their burden that, "but for the Addicks and Barker project, flooding would not have occurred to the level it did" on the subject properties. *Id.*

¶ 68    In contrast to his conclusions in *Upstream Addicks*, Dr. Bedient did not investigate and eliminate other potential causes of the flooding of plaintiffs' properties. He did not assess whether the properties would have flooded absent the operation of the Westchester Pump Station or Mayfair Reservoir. Specifically, in his deposition, the District's counsel asked Dr. Bedient if he had an opinion at what rate and velocity discharged from the Westchester Pump Station was necessary to cause "a restriction in the free flow" of Addison Creek, Dr. Bedient responded that he had not done that analysis. When asked if he analyzed what would have happened to Addison Creek if the Westchester Pump Station were not operating during the July 2010 storm, Dr. Bedient answered that he did not conduct that analysis. He also did not analyze what effect the removal of the Westchester Pump Station would have had on the sanitary sewer systems in Bellwood, Hillside, and Westchester. He further did not have an opinion as to "how much additional infiltration into the sanitary sewers" of Bellwood, Hillside, or Westchester occurred due to the operation of the Westchester Pump Station. Dr. Bedient also did not conduct the analysis as to whether Addison Creek would have remained within its banks during the July 2010 storm if not for the Westchester Pump Station. Similarly, he did not have an opinion as to

29

what amount of storage would have been necessary at the Mayfair Reservoir to protect a plaintiff's home "completely" from flooding in the July 2010 storm. He did not analyze what would have happened to plaintiffs' homes if the Mayfair Reservoir were not present.

¶ 69     Although our finding is based solely on the lack of causation set forth by plaintiffs, we note that Dr. Garcia, the District's expert, explained that he ran models to determine what would have occurred during the July 2010 storm absent the operation of the Westchester Pump Station or the Mayfair Reservoir. He observed that the July 2010 storm exceeded the 100-year or greater return period with rainfall in excess of approximately eight inches in less than 24 hours. He found that the failure to activate the Westchester Pump Station would have increased water levels by 1 to 1½ feet. He explained that the activation of the Westchester Pump Station "had a negligible impact on water levels in Addison Creek while reducing the risk of basement flooding by decreasing water levels at the pumping station."

¶ 70     Dr. Garcia also explained that the Mayfair Reservoir operated as intended and acted to substantially reduce the peak flow of water. According to his models, the Mayfair Reservoir acted to "reduce flood depths by between 0.2 and 0.6 feet when compared with simulated conditions had the reservoir not be [*sic*] present." Dr. Garcia opined that no actions taken by the District "exacerbated" flooding in Bellwood, Hillside, and Westchester and found that the Westchester Pump Station and Mayfair Reservoir acted to minimize the flow as well as the risk of sanitary sewer backups.

¶ 71     As detailed, Dr. Bedient did not offer this necessary opinion regarding causation that, "but for" the District's operations, plaintiffs' properties would not have flooded. We do not base our conclusion on the weight given to Dr. Bedient's opinions but, rather, his failure to perform the requisite analysis to establish that "but for" the District's operations, plaintiffs' properties

30

would not have flooded. *Cf. Upstream Addicks*, 146 Fed. Cl. at 245 (Dr. Bedient concluded that in his opinion none of the subject properties would have flooded "but for" the dams). While we view the evidence in the light most favorable to plaintiffs, Dr. Bedient's expert opinion did not offer any evidence on the causation element, and the lack of any analysis by Dr. Bedient on this point is fatal to plaintiffs' claims of a taking under the Illinois and United States Constitutions. See *St. Bernard Parish*, 887 F.3d at 1362 ("a takings plaintiff bears the burden of proof to establish that the government action caused the injury").

¶ 72    Therefore, we conclude that plaintiffs have failed to show that the District's operation of the Westchester Pump Station and the Mayfair Reservoir subjected their lands to any additional flooding above what would have occurred due to the severe July 2010 storm absent the District's actions. See *Accardi*, 599 F.2d at 429-30 (finding that the plaintiffs failed to establish that the defendant's operation of a dam, power plant, and reservoirs on the Trinity River in northern California cause more flooding than would have occurred during a January 1974 storm had the defendant not constructed these operations). While plaintiffs' property undoubtedly suffered some damage during the July 2010 storm, it is clear that the District "does not owe compensation under the [takings clause] to every landowner which it fails to or cannot protect." *United States v. Sponenbarger*, 308 U.S. 256, 265 (1939). Accordingly, the trial court did not err in granting summary judgment in favor of the District on plaintiffs' takings claims under the Illinois and United States Constitutions.

¶ 73    Even if plaintiffs had established the requisite causation, which we do not find, the record does not support plaintiffs' allegations of frequent floods sufficient to establish a taking. As discussed above, the Illinois Supreme Court in *Hampton* held that temporary flooding may constitute a taking "when the flooding directly and immediately interferes with the owner's

enjoyment and use of the land." *Hampton*, 2016 IL 119861, ¶ 21 (citing *Arkansas Game*, 568 U.S. at 33-34). The supreme court outlined the factors to consider in determining whether a temporary flooding constituted a taking, including the time and duration of the flooding, whether the invasion of the property was an intentional act or a foreseeable result of an authorized government action, and the character of the land and the owner's reasonable investment-backed expectations regarding the use of the land. *Id.* ¶ 25 (citing *Arkansas Game*, 568 U.S. at 39).

¶ 74    In reviewing these factors, the *Hampton* court concluded that plaintiffs had failed to sufficiently allege a taking based on temporary flooding. The court observed that plaintiffs alleged "only one instance of flooding." *Id.* ¶ 26. Significantly, plaintiffs did not allege that the flooding was recurring, the floodwater remained on their properties for an extended period of time, or the damage caused by the flood was unable to be satisfactorily repaired. *Id.*

¶ 75    In their amended complaint following remand, plaintiffs alleged that they had "suffered flooding of similar duration and magnitude," as a result of the District's intentional actions on (1) September 13-16, 2007; (2) September 12-15, 2008; and (3) April 18, 2013. However, the evidence of record does not support this allegation of similar and repeated flooding by plaintiffs. All 28 of the remaining plaintiffs were deposed during discovery and detailed their history of floods in their homes. Ten of the plaintiffs reported that their homes only flooded once, from the July 2010 storm. Six plaintiffs reported "seepage" or other small amounts occurred at times. Nine plaintiffs recalled having other flood issues but were unsure of the dates, including sometime in the 1980s or after 2010. Regarding the other three dates alleged in the complaint, only three plaintiffs testified to having flood issues in 2013, two had a wet spot in 2008, and none stated that they suffered a flood in 2007. This evidence does not support the allegations in the complaint of repeated similar flooding causing "permanent and irreparable damage" to

plaintiffs' properties. We conclude seepage, puddles, or wet spots are not sufficient to support recurrent temporary flooding of "similar duration and magnitude" as the July 2010 storm event here. See *Accardi v. U. S.*, 599 F.2d at 429 ("where no permanent flooding of the land is involved, proof of frequent and inevitably recurring inundation due to governmental action is required"); see also *Hampton*, 2016 IL 119861, ¶ 26 (finding that plaintiffs' initial complaint was insufficient because it only claimed one instance of flooding and did "not alleged that the flooding is recurring or that the water remained on their properties for a prolonged period of time").

¶ 76    Significantly, plaintiffs do not argue on appeal that they suffered flooding on all four dates alleged in the operative complaint. Rather, they contend that a single flood could constitute a taking and rely on *Upstream Addicks* and *Quebedeaux v. United States*, 112 Fed. Cl. 317 (2013). However, plaintiffs' reliance is misplaced because both cases involved allegations of a permanent taking, not a temporary flooding. See *Upstream Addicks*, 146 Fed. Cl. at 248 (applying the *Arkansas Game* factors to determine "whether the government's actions with regard to Addicks and Barker constitute a compensable taking, albeit a permanent one"); *Quebedeaux*, 112 Fed. Cl. at 320 (the plaintiffs alleged that the government's intentional diversion of flood water "constitutes an ongoing, continuous and permanent physical taking" of their property without just compensation). The flooding at issue in *Quebedeaux* involved the inundation of flood waters on the plaintiffs' properties from May 14 to July 17, 2011, after the Army Corps of Engineers purposely opened the Morganza Floodway in the Mississippi River. The plaintiffs alleged that this prolonged flooding "destroyed, damaged and/or devalued their crops, farms, homes, businesses, buildings, structures, equipment, oil and gas wells, fishery waters, and other real and personal property." *Id.* at 319-20.

¶ 77    The evidence presented has not overcome the deficiency observed by the *Hampton* court, *i.e.*, "that the flooding is recurring." *Hampton*, 2016 IL 119861, ¶ 26. In their complaint, plaintiffs alleged that they experienced flooding on four dates across six years, but none of the plaintiffs testified to support this allegation. After viewing the pleadings, depositions, and all admissions in the light most favorable to plaintiffs, the evidence is insufficient to establish a genuine issue of material fact regarding a taking based on temporary, recurring flooding. Thus, the trial court properly granted summary judgment in favor of the District.

¶ 78    Finally, plaintiffs contend that they presented sufficient evidence for a valid claim for constitutional damage under the takings clause of the Illinois Constitution. Specifically, they argue that they have produced both fact and expert witnesses to establish the nature and extent of their damage. The District maintains that the damage prong of the takings clause does not apply in this case because the damage alleged by plaintiffs does not fall within the damage contemplated under the Illinois takings clause. Even if the damage prong applies here, the District asserts that plaintiffs cannot meet their burden of proving constitutional damage because Dr. Bedient's expert opinion did not offer any analysis of the benefits of the District's stormwater management system.

¶ 79    The inclusion of the word "damaged" in the 1870 Illinois Constitution, retained in the 1970 Illinois Constitution, provided for "compensation to property owners whose property was 'injuriously affected' by government action but there had not been a government taking." *Sorrells*, 2015 IL App (3d) 140763, ¶ 26 (quoting *Rigney v. City of Chicago*, 102 Ill. 64, 66 (1881)); see Ill. Const. 1970, art. I, § 15. The inclusion of the damage prong was to "provide broader protection and establish a constitutional remedy for property owners whose real estate is damaged but not taken as a result of public improvements." *Hampton*, 2016 IL 119861, ¶ 14.

"However, what constitutes a taking is the same under both clauses." *Id.* ¶ 31.

¶ 80    "When 'the owner of property is seeking to recover the just compensation guaranteed by the constitution for the lawful damaging of private property for public use, the burden is upon such owner to establish the existence and amount of the damage he claims.' " *Id.* ¶ 27 (quoting *Kane v. City of Chicago*, 392 Ill. 172, 177 (1945)). "Property is considered damaged for purposes of the takings clause if there is 'any direct physical disturbance of a right, either public or private, which an owner enjoys in connection with his property; a right which gives the property an additional value; a right which is disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally.' " *Id.* (quoting *Citizens Utilities Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 25 Ill. App. 3d 252, 256 (1974)). "Where no property is actually taken, an owner of damaged property may assert a right to compensation in an action at law." *Id.* (citing *Illinois Power & Light Corp. v. Peterson*, 322 Ill. 342, 347 (1926)). "Whether claimed by the owner as a plaintiff in an action at law or as a defendant in an eminent domain proceeding, 'the right to damages is the same and is based on the [takings clause].' " *Id.* (quoting *Illinois Power & Light*, 322 Ill. at 347).

¶ 81    Although we recognize that plaintiffs have presented evidence of damage to their homes and property as a result of the flooding following the July 2010 storm, they have not demonstrated the necessary causation for a constitutional damage claim. As previously stated, the Illinois takings clause provides, "Private property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. 1970, art. I, § 15. The right to constitutional damages also requires proof that the private property was damaged for public use, *i.e.*, that the government entity caused the damage to the private property. See *id.*; *Hampton*, 2016 IL 119861, ¶ 27.

¶ 82    As discussed above, plaintiffs' expert, Dr. Bedient, did not conduct an analysis to determine if the cause of plaintiffs' flooding was the District's actions. Specifically, his expert opinion failed to consider whether plaintiffs' homes would have flooded during the July 2010 storms absent the District's management of the Westchester Pump Station and the Mayfair Reservoir. Absent this evidence of causation, plaintiffs cannot show that their property was damaged for public use, and summary judgment was proper on this claim.

¶ 83    Based on the following reasons, we affirm the decision of the circuit court of Cook County.

¶ 84    Affirmed.

*Hampton v. Metropolitan Water Reclamation District of Greater Chicago*,
**2025 IL App (1st) 231381**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 11-CH25822, 11-CH-25985; the Hon. Neil H. Cohen, Judge, presiding. |
| **Attorneys for Appellant:** | Glen J. Dunn Jr., of Glen J. Dunn & Associates, Ltd., of Chicago, and Lawrence G. Dunbar, of Dunbar Law Firm, PLLC, of Cypress, Texas, for appellants. |
| **Attorneys for Appellee:** | Susan T. Morakalis, Jorge T. Mihalopoulos, Anastasios T. Foukas, and J. Mark Powell, of Metropolitan Water Reclamation District of Greater Chicago, of Chicago, for appellee. |